## AMERADA HESS SHIPPING CORPORATION, Plaintiff,

v.

## ARGENTINE REPUBLIC, Defendant.

## UNITED CARRIERS, INC., Plaintiff,

v.

## ARGENTINE REPUBLIC, Defendant.

Nos. 85 Civ. 4365 (RLC), 85 Civ. 4378 (RLC).

United States District Court, S.D. New York.

May 5, 1986.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff Amerada Hess Shipping Corp.; Richard H. Webber, Douglas R. Burnett, of counsel.

Burke & Parsons, New York City, for plaintiff United Carriers, Inc.; Raymond J. Burke, Jr., Francis C. Peters, of counsel.

Kaplan Russin & Vecchi, Washington, D.C., Kaplan Russin Vecchi & Kirkwood, New York City, for defendant Republic of Argentina; Bruno A. Ristau, Washington, D.C., Jeanne Ferris Siegel, New York City, of counsel.

OPINION

ROBERT L. CARTER, District Judge.

The Argentine Republic, defendant in these two related actions, has moved to dismiss both of the complaints for lack of subject-matter jurisdiction by virtue of the Foreign Sovereign Immunities Act ("FSIA"), Pub.L. No. 94–583, 90 Stat. 2891, *codified at* 28 U.S.C. §§ 1330, 1332(a)(2)–(4), 1391(f), 1441(d) and 1602–1611.

Plaintiff United Carriers, Inc. ("United Carriers"), a Liberian corporation, owned the Hercules, a crude oil tanker. Plaintiff Amerada Hess Shipping Corporation ("Amerada Hess"), also a Liberian corporation, time-chartered the vessel to transport Alaskan North Slope crude oil from Valdez, Alaska to a Hess oil refinery in the Virgin Islands. Because her width precluded passage through the locks of the Panama Canal, the Hercules sailed between these two points by travelling around the southern tip of South America at Cape Horn.

On April 2, 1982, the Argentine Republic invaded the islands known as the Falklands to the English-speaking world, and as the Malvinas to the Spanish-speaking. Great Britain defended its crown colony off of the eastern coast of Argentina, and war between the two nations ensued. Throughout that war, Liberia remained a neutral nation. The Hercules, however, could not remain wholly disengaged from the post-colonial struggle raging in the South Atlantic. On May 5, while voyaging from Val-

dez to St. Croix, she diverted her course upon the request of the Argentine Navy in order to search for survivors of the General Belgado, an Argentine Navy cruiser sunk by a British submarine. She was later released from this task and completed her voyage to St. Croix.

On May 25, 1982, the Hercules began its return voyage in ballast, or without cargo, to Valdez. Without provocation or warning, Argentine military aircraft began to bomb the neutral merchant vessel three separate times on June 8: once at 1350 Greenwich Mean Time ("G.M.T."), when she was located at 46 degrees 10 minutes South latitude, 49 degrees 30 minutes West longitude; at 1430 G.M.T. when she was at 45 degrees 16 minutes South latitude, 48 degrees 25 minutes West longitude; and at 1625 G.M.T. when she was at 46 degrees 8 minutes South latitude, 48 degrees 55 minutes West longitude. Unaccountably, a belated directive to change course or suffer attack was received by the Hercules after the third attack, between 1720 and 1800 G.M.T. The complaints allege that the air attacks took place outside of the war zones designated by both the Argentine Republic and Great Britain. The bombing and rocket attacks damaged the decks and hull of the Hercules and left her with an undetonated bomb lodged in her starboard side. Thus disabled, she reversed course and sailed towards Rio de Janeiro, Brazil, the nearest safe port of refuge. United Carriers decided that it would be too dangerous to attempt to remove the undetonated bomb and repair the Hercules. The tanker was scuttled 250 nautical miles off of the Brazilian coast.

Amerada Hess alleges that it has been unable to engage Argentine lawyers to pursue a claim for its losses in the Argentine Republic's courts. It attributes this failure to "the politically charged nature of the claim and knowledge that the claim is opposed by the Argentine Government." Verified Complaint of Amerada Hess, ¶ 44. Affidavits submitted in opposition to the motion to dismiss show that the attorneys for Amerada Hess have corresponded with two Argentinian lawyers who refused to press its claims in the Argentine courts. Amerada Hess and United Carriers seek to obtain relief from this court, alleging jurisdiction pursuant to the Alien Tort Act, 28 U.S.C. § 1350. Amerada Hess also alleges jurisdiction "according to the principle of universal jurisdiction, recognized in customary international law." Verified Complaint of Amerada Hess, ¶ 5.

## DISCUSSION

Foreign sovereign immunity has a venerable history in this country's courts, dating back at least to Chief Justice Marshall's decision in *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). The doctrine developed over the next century and a half in a world of broadened state activity and burgeoning international trade. By the middle of this century, two aspects of foreign sovereign immunity that deserve mention had evolved. The first was substantive: the doctrine of "restrictive" immunity, which accords a foreign sovereign immunity for its public acts (*jure imperii*) but not for its commercial, or quasi-private, activities. The second was procedural: usually, but not always, foreign nations would seek immunity from the State Department, which would submit "suggestions of immunity" to the courts where it determined that immunity was appropriate. *See Verlinden B. V. v. Central Bank of Nigeria*, 461 U.S. 480, 487–88, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). Political pressures exerted by foreign nations not infrequently affected the State Department's determination, *id.*, leading to lack of uniformity and clarity in the doctrine. In 1976, Congress sought to codify the restrictive doctrine of foreign sovereign immunity and to place responsibility for making determinations of immunity squarely within the judiciary. H.Rep. No. 94–1487, 94th Cong., 2d Sess. 6–7 (1976), *reprinted at* 1976 U.S. Code Cong. & Ad.News 6604, 6605. Congress was emphatic that the FSIA be the sole means of assessing claims of immunity. That interest is apparent from the structure of the FSIA, which unequivocally states that:

Subject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. A foreign state is subject to jurisdiction in the courts of this nation if, and only if, an FSIA exception empowers the court to hear the case. The legislative history strengthens this reading. The House report states that the FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States. It is intended to preempt any other State or Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns, their political subdivisions, their agencies, and their instrumentalities." H.Rep. No. 94–1487 at 12; 1976 U.S.Code Cong. & Ad.News at 6610. Almost without exception, courts interpreting the FSIA have assumed that the FSIA is the exclusive source of jurisdiction over foreign sovereigns, *Frolova v. U.S.S.R.*, 761 F.2d 370 (7th Cir.1985) (*per curiam*), even in the context of other jurisdictional grants. *O'Connell Machinery Co. v. M.V. Americana*, 734 F.2d 115 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984) (admiralty); *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui",* 639 F.2d 872 (2d Cir.1981) (diversity); *In Re Korean Air Lines Disaster of September 1, 1983,* Misc. No. 83–0345 (D.D.C. September 1, 1985) (Alien Tort Act); *Siderman v. Republic of Argentina,* No. CV 82–1772–RMT(MCx) (C.D.Cal. March 7,

1985) (Alien Tort Act). *But see Von Dardel v. U.S.S.R.,* 623 F.Supp. 246 (D.D.C. 1985) (FSIA does not effect *pro tanto* repeal of Alien Tort Act jurisdiction).

Plaintiffs' claims undeniably fall outside of the exceptions to blanket foreign sovereign immunity provided by the FSIA. The only provision for tort claims, where the foreign sovereign has not waived immunity, requires that the "damage to or loss of property" occur "in the United States."[1] Interpretation of similar language in terms of the commercial activity exception in § 1605(a)(2) has been breathtakingly broad. *See Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903 (S.D.N.Y.1986) (Carter, J.). Yet even that breadth is of no avail to these Liberian plaintiffs, who can claim no loss whatsoever occurring in the United States. In addition, one Court of Appeals has interpreted the legislative history of § 1605(a)(5) to require that the tortious act or omission itself occur in the United States. *Frolova v. U.S.S.R., supra,* 761 F.2d at 379. While we need not adopt that reasoning, we note that it is further evidence that the facts underlying this case are well beyond the purview of the § 1605(a)(5) exception.

Plaintiffs argue that the Alien Tort Act provides the basis for jurisdiction that the FSIA denies. That statute gives the district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In their view, when the First Congress adopted the Judiciary Act of 1789—of which the Alien Tort Act is a part—it intended to confer jurisdiction over suits such as the instant case to federal district courts. Neither the FSIA itself nor its legislative history mentions the Alien

---

1. 28 U.S.C. § 1605(a)(5). That subsection denies a foreign state immunity where:

money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except that this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Tort Act. Since repeal by implication is disfavored, the cause of action created by the Alien Tort Act survives the passage of the FSIA.

Both the premises and the conclusion of this inventive argument must be rejected. First, we do not credit plaintiffs' contention that the Argentine Republic would not have enjoyed foreign sovereign immunity in an action such as this in 1789. Second, even if we accept plaintiffs' version of legal history, the language of the Alien Tort Act is silent as to foreign sovereign immunity. Therefore, the FSIA does not repeal the Alien Tort Act any more than it repeals any other jurisdictional act that by its terms may include actions brought against foreign sovereigns.

No case law supports the assertion that a foreign sovereign state would not have enjoyed immunity in 1789. As evidence of their contention that a foreign sovereign would not be immune in the minds of the drafters of the Alien Tort Act, plaintiffs cite the fact that a sovereign would not enjoy sovereign immunity in its own prize courts. Nanda Affidavit at 5, Plaintiffs' Joint Exhibit 12. By analogy, they suggest, a foreign sovereign would not enjoy immunity in another nation's municipal courts. Contemporary legal theory recognizes that foreign sovereign immunity, based on comity, is a very different matter from the sovereign immunity accorded the state in its own courts, based on separation of powers. The analogy would fail today; there is no reason to assume that it would have succeeded in 1789. Moreover, if we are to adopt the iconoclastic view that the Alien Tort Act preserves the vulnerability to suit of foreign sovereigns extant at its passage, we need evidence more forceful than a hypothetical argument by analogy. Plaintiffs also base their historical argument on two scholarly pieces, G. Badr, *State Immunity: An Analytical and Prognostic View* (1984) and S. Sucharitkul, *State Immunities and Trading Activities in International Law* (1959), that discover the origin of nation-state—as opposed to personal—foreign sovereign immunity in *The Schooner Exchange*, decided in 1812.

That inaccurate contention can quickly be disproven by recourse to early court reports. *Nathan v. Virginia*, 1 Dall. (Pa.) 77, 1 L.Ed. 44 (1781) granted the state of Virginia foreign sovereign immunity in Pennsylvania's courts.

Even if foreign sovereign immunity would have been extended to a nation under the circumstances of this case in 1789, the FSIA's grant of immunity is not a repeal of the Alien Tort Act. The Alien Tort Act speaks in terms of plaintiffs and causes of action. It is utterly silent as to classes of defendants. We may assume, without recourse to legal history, that a foreign sovereign could be sued under the Alien Tort Act if one were to regard the statute in isolation. Yet the FSIA does not repeal the Alien Tort Act because it narrows the class of defendants. It does the same to many of the jurisdictional statutes in the United States Code. The FSIA could only be said to repeal the Alien Tort Act if the statute covered *only* claims against foreign sovereigns, an argument that the plaintiffs do not, because they cannot, make. Thus, it is irrelevant that repeal by implication is disfavored. The FSIA effects no repeal.

Plaintiffs next argue that foreign sovereign immunity is not absolute or requisite, and that the Argentine Republic's refusal to repay the plaintiffs is so manifest a violation of its obligation under international law that this country has a right to refuse it immunity. Let us assume that this argument is valid as a matter of international law. Nonetheless, that fact does not empower this court to create an *ad hoc* exception to a Congressional statute in order to hear this case. Federal courts, it bears mentioning at this juncture, are courts of limited jurisdiction. Perhaps Congress could empower federal courts to hear cases such as this; the court, however, is constrained by Congress's failure to do so.

Two district courts have already rejected arguments that the Alien Tort Act creates an implied exception to the FSIA. *Sider-*

man, supra; *Korean Air Lines, supra.* In *Siderman,* the court dismissed an action brought against Argentina and one of its provinces for torture and the taking of property by the former military regime. The court reviewed the legal history of foreign sovereign immunity and concluded that the Alien Tort Act "does not provide an exemption to foreign sovereign immunity ...." *Siderman,* slip op. at 3. In *Korean Air Lines,* the court dismissed wrongful death claims brought against the Soviet Union for deaths resulting when a commercial airplane that had strayed into Soviet territory was shot down. Although the court relied on both the FSIA and the act of state doctrine,[2] it clearly found that the Alien Tort Act did not carve out an exception to the FSIA's requirements. "[T]o hold that the Alien Tort Claims Act gives a cause of action and subject matter jurisdiction where the FSIA forbids it would make a nullity of the Foreign Sovereign Immunities Act." *Korean Air Lines,* slip op. at 11.

Both *Siderman* and *Korean Air Lines* dismissed claims against foreign sovereigns for actions occurring within the foreign sovereigns' territory. Yet that fact, relevant to application of the act of state doctrine, is not relevant to the question of foreign sovereign immunity at issue here. In *Siderman, Korean Air Lines,* and the instant case, a violation of the law of nations is alleged. Where the tort is committed outside of the United States, the effect of the FSIA on the court's jurisdiction does not vary with the *locus delicti.* In addition, the Court of Appeals for the District of Columbia has assumed, albeit in dicta, that the standards of the FSIA apply to actions brought pursuant to the Alien Tort Act where the alleged tort has occurred outside of the foreign sovereign's territory. *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 776 n. 1 & 805 n. 13 (D.C.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1354,

84 L.Ed.2d 377 (1985) (separate concurrences of Edwards, J. and Bork, J.).

The court has addressed plaintiffs' arguments in greater detail than they merit, given the clarity of the FSIA's language and the precedents that support this result. Such attention is warranted only because similar arguments have been accepted—incorrectly, we feel—in *Von Dardel v. U.S. S.R.,* 623 F.Supp. 246 (D.D.C.1985). In *Von Dardel,* the court entered a default judgment against the Soviet Union in an action brought against it for the "unlawful seizure, imprisonment and possibly death" of Raoul Wallenberg, the heroic Swedish diplomat. In addition to waiver arguments inapplicable here, the court found that it had jurisdiction because the FSIA should not be read "to extend immunity to clear violations of universally recognized principles of international law." *Von Dardel,* 623 F.Supp. at 254. It based this interpretation on language in FSIA's legislative history stating that the statute incorporated standards of international law. *Id.* at 253. With all respect, nothing in the FSIA or its legislative history supports that interpretation. The language cited by the *Von Dardel* court, H.Rep. No 94–1487 at 14, 1976 U.S.Code Cong. & Ad.News at 6613, says merely that Congress sought to adopt internationally accepted standards of foreign sovereign immunity, not that immunity would be waived for violations of international law.

Finally, we note that the principle of universal jurisdiction cited by Amerada Hess in its complaint does not provide a basis for jurisdiction in a civil case. That doctrine only provides for criminal jurisdiction. *See* Restatement (2d) Foreign Relations Law of the United States § 404 (Tent. Draft No. 2, 1981).

For all of these reasons, defendants' motions must be granted. Both complaints in these actions are dismissed.

IT IS SO ORDERED.

---

**2.** The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). It is a judge-made prudential doctrine.