**AMERADA HESS SHIPPING CORPORATION, Appellant,**

v.

**ARGENTINE REPUBLIC, Appellee.**

**UNITED CARRIERS, INC., Appellant,**

v.

**ARGENTINE REPUBLIC, Appellee.**

Nos. 333, 334, Dockets 86–7602, 86–7603.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1986.

Last Supplemental Brief filed July 24, 1987.

Decided Sept. 11, 1987.

---

Douglas R. Burnett, New York City (Hill, Rivkins, Carey, Loesberg, O'Brien &

Mulroy, Richard H. Webber, of counsel), for appellant Amerada Hess Shipping Corp.

Burke & Parsons, New York City (Raymond J. Burke, Jr., Frances C. Peters, of counsel), for appellant United Carriers, Inc.

Bruno A. Ristau, Washington, D.C. (Kaplan Russin & Vecchi, Kaplan Russin Vecchi & Kirkwood, New York City, Anthony E. Davis, of counsel), for appellee Argentine Republic.

Frank L. Wiswall, Jr., Reston, Va., for The Republic of Liberia, as amicus curiae.

James T. Lafferty, New York City, for Seamen's Church Institute of New York and New Jersey, as amicus curiae.

Richard K. Willard, Asst. Atty. Gen., David Epstein, Michael J. Singer, Attys., Civ. Div., Dept. of Justice, Washington, D.C., Rudolph W. Giuliani, U.S. Atty., New York City, Abraham D. Sofaer, Legal Adviser, Elizabeth Verville, Deputy Legal Advisor, Bruce C. Rashkow, Eugene Pinkelmann, Attys., Dept. of State, Washington, D.C., for the U.S., as amicus curiae.

Before FEINBERG, Chief Judge, OAKES and KEARSE, Circuit Judges.

FEINBERG, Chief Judge:

This case presents the important question whether a federal district court has jurisdiction over a claim that a foreign sovereign, in violation of international law, attacked on the high seas a neutral ship engaged in the United States domestic trade. Amerada Hess Shipping Corporation (Amerada) and United Carriers, Inc. (United) appeal from a decision of the United States District Court for the Southern District of New York, Robert L. Carter, J., dismissing their complaint for lack of jurisdiction, 638 F.Supp. 73 (S.D.N.Y.1986). Appellants argue that both the Alien Tort Statute, 28 U.S.C. § 1350, and the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602–1611, provide jurisdiction over their claims that the Republic of Argentina destroyed an oil tanker on the high seas in violation of international law. We conclude that the Alien Tort Statute does provide jurisdiction and that the FSIA does

not bar it. Accordingly, we reverse and remand to the district court.

## I. Background

Because the district court dismissed United's complaint for lack of jurisdiction, we must accept appellants' allegations as true. In 1977, Amerada entered a long-term time-charter agreement with United for use of the oil tanker HERCULES. Amerada used HERCULES to carry oil from Alaska, around the southern tip of South America, to its refinery in the United States Virgin Islands. This route took HERCULES near the area in the South Atlantic where, in April 1982, an armed conflict began between Argentina and the United Kingdom that became known in this country as the Falklands War.

On May 25, 1982, HERCULES embarked from the Virgin Islands, without cargo but fully fueled, headed for Alaska. On June 3, in an effort to protect United States interest ships, the United States Maritime Administration telexed to both the United Kingdom and Argentina a list of United States flag vessels and United States interest Liberian tankers (like HERCULES) that would be traversing the South Atlantic, to ensure that these neutral vessels would not be attacked. The list included HERCULES.

By June 8, HERCULES was about 600 nautical miles off the Argentine coast and nearly 500 miles from the Falkland Islands, in international waters, well outside the "exclusion zones" declared by the warring parties. That afternoon, HERCULES was attacked without warning in three different strikes by Argentine aircraft using bombs and air-to-surface rockets.

Following these attacks, HERCULES, damaged but not destroyed, headed for safe refuge in the port of Rio de Janeiro, Brazil. Although HERCULES arrived safely in Brazil, her deck and hull had both suffered extensive damage, and a bomb that had penetrated her side remained undetonated in one of her tanks. Following an investigation by the Brazilian navy, United determined that it would be unreasonably hazardous to attempt removal of the undetonated bomb. Accordingly, on July 20, 1982, approximately 250 miles off the Brazilian coast, HERCULES was scuttled. United's loss on the sunken ship is claimed at $10,000,000 and Amerada's loss on the fuel that went down with the ship is claimed at $1,901,259.07.

Following a series of unsuccessful attempts to receive a hearing of their claims by the Argentine government or to retain Argentine attorneys to prosecute their claims in the courts of that country, appellants filed their suits in the district court. The district court found that a "foreign state is subject to jurisdiction in the courts of this nation if, and only if, an FSIA exception empowers the court to hear the case." 638 F.Supp. at 75. Concluding that no FSIA exception covered these facts, the district court dismissed the suits for lack of jurisdiction. This consolidated appeal followed.

## II. Violation of International Law

■ The facts alleged by appellants, if proven, would constitute a clear violation of international law. "The law of nations 'may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2d Cir.1980) (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820)). Of course, the mere fact that many or even all nations consider an act a violation of their domestic law does not suffice to create a principle of international law. *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir.1975). "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation." *Filartiga*, 630 F.2d at 888. In this case, treaties, case law and treatises establish that Argentina's conduct, as alleged by appellants, violates settled principles of international law.

International treaties and conventions dating at least as far back as the last century recognize the right of a neutral ship to free passage on the high seas. Broad international recognition of the rights of neutrals can be found in paragraph 3 of The Declaration of Paris of 1856: "Neutral goods, with the exception of contraband of war, are not liable to capture under enemy's flag."

■ A more contemporary statement of the international concern and accord on this issue may be found in The Geneva Convention on the High Seas of 1958 (Convention on the High Seas), to which both Argentina and the United States were signatories. The Convention on the High Seas maps the general usage and practice of nations with regard to the rights of neutral ships in time of war. Article 22 of that treaty states that a warship encountering a foreign merchant vessel on the high seas may not board her without grounds for suspecting her of engaging in piracy, or the slave trade, or traveling under false colors. Even when there are grounds for such suspicion, the proper course is to investigate by sending an officer to inspect the ship's documents or even to board her, not to commence an attack. If such inspection fails to support the suspicions, the merchant vessel shall "be compensated for any loss or damage that may have been sustained." Article 23 of the Convention on the High Seas makes similar provisions for aircraft that have grounds to suspect a neutral vessel. Clearly, Argentina's alleged conduct in this case, bombing HERCULES and refusing compensation, violates the Convention on the High Seas. More recently, the Law of the Sea Convention of 1982 explicitly incorporated these provisions into its text. Argentina is a signatory to the Law of the Sea Convention and the United States has endorsed the relevant sections of it.

Other international accords adopted by the United States supporting a similar view of the rights of neutral ships include The London Naval Conference of 1909, the International Convention Concerning the Rights and Duties of Neutral Powers in Naval War (Hague Convention, 1907) and the Pan-American Convention Relating to Maritime Neutrality of 1928, to which Argentina was a signatory. No agreement has been called to our attention that would cast doubt on this line of authority.

As to "judicial decisions recognizing and enforcing" the rights of neutral ships on the high seas, federal courts have long recognized in a variety of contexts that attacking a merchant ship without warning or seizing a neutral's goods on the high seas requires restitution. See, e.g., *Talbot v. Jansen*, 3 U.S. (3 Dall.) 133, 161, 1 L.Ed. 540 (1795); *The Lusitania*, 251 F. 715, 732–36 (S.D.N.Y.1918) (dictum); cf. The I'm Alone (Canada v. United States), 3 U.N. Rep.Int.Arb.Awards 1609 (1933). Similarly, the academic literature on the rights of neutrals is of one voice with regard to a neutral's right of passage. See, e.g., Rappaport, "Freedom of the Seas," 2 Encyclopedia of Amer.For.Policy 387 (1978); Restatement of Foreign Relations Law of the United States (Revised) § 521 reporters' note 1, § 522 (Tent.Draft No. 6 1985).

In short, it is beyond controversy that attacking a neutral ship in international waters, without proper cause for suspicion or investigation, violates international law. Indeed, the relative paucity of cases litigating this customary rule of international law underscores the longstanding nature of this aspect of freedom of the high seas. Where the attacker has refused to compensate the neutral, such action is analogous to piracy, one of the earliest recognized violations of international law. See 4 W. Blackstone, Commentaries 68, 72. Argentina has cited no contrary authority. Accordingly, we turn to the jurisdictional ramifications of our holding that appellants have stated a claim of a violation of international law.

### III. The Alien Tort Statute

■ The Alien Tort Statute, 28 U.S.C. § 1350, provides:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of

the law of nations or a treaty of the United States.

Although seldom employed, the Alien Tort Statute means what it says. If an alien brings a suit, for a tort only, that sufficiently alleges a violation of the law of nations, then the district court has jurisdiction. See *Filartiga*, 630 F.2d 876. All of these requirements are met in the instant case. Appellants are aliens; they are Liberian corporations. This suit is for a tort only—the bombing of a ship without justification. Also, as discussed above, the suit alleges a violation of international law.

Argentina argues, however, that the Alien Tort Statute provides jurisdiction only over individuals, not over sovereign states. It claims that the United States recognized absolute sovereign immunity in 1789, when Congress enacted the Alien Tort Statute. Therefore, Argentina contends, if Congress had intended to provide jurisdiction over sovereigns, it would have done so explicitly.

As a preliminary matter, it may be—at least as to loss of a vessel under the circumstances alleged here—that absolute sovereign immunity did not govern when the Alien Tort Statute was enacted. Rather, courts considered the immunity that was granted to be merely "a matter of grace and comity on the part of the United States." *Verlinden v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983). It was recognized that the United States had the power to exercise jurisdiction over a foreign sovereign, if it saw fit to do so. See *The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 146, 3 L.Ed. 287 (1812). Thus, for example, if a foreign sovereign seized a vessel at sea in violation of the law of nations, "the prize property which [the vessel] brings into our ports is liable to the jurisdiction of our Courts," notwithstanding any claim of sovereign immunity. *The Santissima Trinidad*, 20 U.S. (7 Wheat.) 283, 354, 5 L.Ed. 454 (1822). See also The Prins Frederik, 2 Dods. 451 (1820) (English case), in which the court indicated that it would have jurisdiction over a foreign sov-

ereign that had violated the law of salvage, if the sovereign did not make "recompense" on its own.

■ We need not decide, however, whether a court faced with the circumstances of this case in 1789, the year the Alien Tort Statute was enacted, would have exercised jurisdiction over a foreign sovereign. In construing the Alien Tort Statute, "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Filartiga*, 630 F.2d at 881. The Alien Tort Statute is no more than a jurisdictional grant based on international law. The evolving standards of international law govern who is within the statute's jurisdictional grant as clearly as they govern what conduct creates jurisdiction. Cf. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 457, 84 S.Ct. 923, 955, 11 L.Ed.2d 804 (1964) (White, J., dissenting) (under Act of State doctrine, "reasons for nonreview ... lose much of their force when the foreign act of state is shown to be a violation of international law").

Thus, we must look to modern international law to decide whether the statute provides jurisdiction over a foreign sovereign. For example, if a current norm of international law immunized sovereigns for behavior that, if committed by an individual, would be a violation of international law, such an action by a sovereign would not be a tort "committed in violation of the law of nations." The modern view, however, is that sovereigns are not immune from suit for their violations of international law.[1] See Paust, Federal Jurisdiction Over Extraterritorial Acts of Terrorism and Nonimmunity for Foreign Violators of International Law under the FSIA and the Act of State Doctrine, 23 Va.J.Int'l L. 191, 221–32 (1983); Bazyler, Litigating the International Law of Human Rights: A "How To" Approach, 7 Whittier L. Rev. 713, 733–34 (1985).

■ That international law currently denies immunity for violations of international law is not surprising, when one considers

1. After argument, the panel requested and received supplemental briefs on this issue.

that international law consists primarily of rules guiding the conduct of nations. If sovereign acts were immunized today from scrutiny under international law, the exception would nearly swallow the rule. For example, the emerging international law prohibition of genocide, see D'Amato, The Concept of Human Rights in International Law, 82 Colum.L.Rev. 1110, 1127–29 (1982), would make little sense, even in theory, if sovereign states were not covered by the prohibition. Indeed, the sovereign immunity defense raised by Nazi war criminals at the Nuremberg trials was rejected by the international tribunal. International Military Tribunal (Nuremberg), Judgment and Sentences (1946), reprinted in 41 Am.J.Int'l L. 172, 221 (1947). ("The principle of international law, which under certain circumstances, protects the representatives of a state, cannot be applied to acts which are condemned as criminal by international law."). Since the sinking of a neutral vessel on the high seas without justification violates a substantive principle of international law, no matter who does the sinking, there is no immunity under international law in this case. We hold, therefore, that the Alien Tort Statute provides jurisdiction over Argentina.

## IV. The FSIA

Argentina also contends that, regardless of whether the Alien Tort Statute would provide jurisdiction, the FSIA is now the exclusive basis for obtaining jurisdiction over foreign sovereigns. We undertake our review of the FSIA mindful of the tenet of statutory construction that "[w]here fairly possible, a United States statute is to be construed so as not to bring it into conflict with international law." Restatement of Foreign Relations Law of the United States (Revised) § 134 (Tent.Draft No. 6, 1985). See The Charming Betsy, 6 U.S. (2 Cranch) 137, 143, 2 L.Ed. 208 (1804). Since international law would deny immunity in these circumstances, we would construe the FSIA to grant immunity only if Congress clearly expressed such an intent.

■ In support of its view that the FSIA preempts the jurisdictional grant of the Alien Tort Statute, Argentina points to the apparently comprehensive language of this court in O'Connell Machinery Co. v. M.V. "Americana", 734 F.2d 115 (2d Cir.), cert. denied, 496 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984): "The Foreign Sovereign Immunities Act insulates foreign states from the exercise of federal jurisdiction, except under the conditions specified in the Act." Id. at 116. The Supreme Court has expressed similar views. See Verlinden, 461 U.S. at 496–97, 103 S.Ct. at 1972–73 (1983). The view of the FSIA as the sole basis for United States jurisdiction over foreign sovereigns can be traced to the statute's legislative history. For example, the House Report explains that the FSIA "sets forth the sole and exclusive standards to be used in resolving questions of sovereign immunity." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 12, reprinted in 1976 U.S.Code Cong. & Admin.News 6604, 6610 (House Report). This authority accurately states the general rule. As discussed below, however, Congress was not focusing on violations of international law when it enacted the FSIA. Therefore, we do not believe these pronouncements were intended to cover all violations of international law in general and actions under the Alien Tort Statute in particular.

A close examination of the legislative history of the FSIA demonstrates that Congress did not intend to remove existing remedies in United States courts for violations of international law of the kind presented here. Congress sought to achieve three major goals through the FSIA. First, it intended to incorporate into United States law the "restrictive" theory of sovereign immunity in accordance with international law (no immunity for "commercial or private" sovereign acts). Second, it sought to make certain that the judicial rather than the executive branch would apply the law, so "that these often crucial decisions are made on purely legal grounds and under procedures that insure due process." House Report at 6606. Third, it hoped to eliminate many of the procedural problems that suits against foreign sovereigns create (e.g. service of process, execution of judgment) by providing

comprehensive rules for these aspects of a suit. See House Report at 6605–06. None of these goals suggests that Congress intended to eliminate the jurisdictional grant of the Alien Tort Statute for violations of international law.

The FSIA's focus on commercial concerns pervades the entire statute. The impetus for the enactment of the FSIA was Congress' awareness that the increased commercial interaction of foreign states with United States citizens "call[s] into question whether our citizens will have access to the courts in order to resolve ordinary legal disputes." House Report at 6605. Thus, the act adopted a theory of immunity whose focus is limited to commercial situations, and the non-consensual exceptions to sovereign immunity that it supplies are almost exclusively restricted to commercial activities as well. (The one major exception is section 1605(a)(5), which deals with private torts). International law violations are simply not discussed in the statute or the legislative history outside of the commercial context. Thus, international law violations were not the focus of the "comprehensive" language of the drafters of the FSIA anymore than they were the focus of the Supreme Court in the *Verlinden* case, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81. We would consider it odd to hold that, by enacting a statute designed to narrow the scope of sovereign immunity in the commercial context, Congress, though silent on the subject, intended to broaden the scope of sovereign immunity for violations of international law.

The other goals of the FSIA, to place immunity decisions firmly in the courts, and to codify procedures for suits against sovereigns, do not suggest an intent to provide immunity for violations of international law outside of the commercial context. Prior to the FSIA, a foreign sovereign would frequently obtain immunity by seeking the intervention of the United States State Department. This left the State Department in an awkward position and parties dealing with foreign governments in an uncertain one. House Report at 6607. At the same time, the United States found that "[i]n virtually every country ... sovereign immunity is a question of international law to be determined by the courts." Id. at 6608. Requests by the United States for immunity in foreign courts frequently failed. Id. at 6607. Accordingly, through the FSIA, Congress made immunity decisions the exclusive province of the courts. This provided certainty to parties coming into contact with foreign sovereigns and brought United States practice into conformity with the immunity practices of most other nations. The elimination of the executive branch's role in making immunity decisions certainly does not suggest an intent to provide immunity for violations of international law. Similarly, the procedural goals of the FSIA in no way require an implicit repeal of the jurisdictional grant of the Alien Tort Act; these procedural rules would simply apply to a suit under that statute as well.

Not only is the legislative history of the FSIA devoid of any indication that Congress intended the FSIA to bar jurisdiction under the unusual circumstances of this case, a suit under the Alien Tort Act for a violation of international law, but, in our view, construing the FSIA to require that result would actually frustrate Congress' purpose. The "central premise" of the FSIA was that "decisions on claims by foreign states to sovereign immunity are best made by the judiciary on the basis of a statutory regime which *incorporates standards recognized under international law*." House Report at 6613 (emphasis added). Thus, although Congress did not focus on suits for violations of international law, it clearly expected courts to apply the international law of sovereign immunity. As we have seen, under international law, Argentina would not be granted sovereign immunity in this case. Therefore, a grant of immunity here would fly in the face of this central premise. Since Congress did not express a clear intent to contradict the immunity rules of international law, and, indeed, left the Alien Tort Statute in force, we conclude that the FSIA does not preempt the jurisdictional grant of the Alien Tort Statute.

## V.   Personal Jurisdiction

■ Of course, even given the jurisdictional grant of the Alien Tort Statute, the district court must have constitutionally satisfactory personal jurisdiction over the defendant. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 313 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Under *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), a nonresident defendant must have sufficient contacts with the forum, so that the exercise of jurisdiction will not offend notions of fair play and substantial justice. In the international context, the "forum" that the contacts must relate to is the United States itself. See *Texas Trading & Milling Corp.*, 647 F.2d at 314. Thus, we must examine the extent:

> to which defendants availed themselves of the privileges of American law, the extent to which litigation in the United States would be foreseeable to them, the inconvenience to defendants of litigating in the United States, and the countervailing interest of the United States in hearing the suit.

Id. (citations omitted). See Kane, Suing Foreign Sovereigns: A Procedural Compass, 34 Stan.L.Rev. 385, 404–407 (1982).

In this case, we find that the constitutional requirements for personal jurisdiction are satisfied. We note at the outset that certain universal offenses, like piracy and genocide, are offenses against the law of nations wherever they occur. See Restatement of Foreign Relations Law of the United States (Revised) § 404 (Tent.Draft No. 6, 1985). The allegations here probably fall within this class of offense. Since, under international law, a state may punish these offenses even when they occur outside the state's territory, it has been argued that such occurrences always have sufficient "effects" within the United States to satisfy due process. See Paust, Draft Brief Concerning Claims to Sovereign Immunity and Human Rights: Non-immunity for Violations of International Law under the FSIA, 8 Hous.J. of Int'l L. 49, 69–70 (1985).

We need not decide that question in this case, however, since the actions alleged here are sufficiently related to the United States for Argentina to have been on notice that it might be sued here. Argentina was specifically notified by the United States that HERCULES would be passing through the South Atlantic on neutral business, clearly revealing to Argentina a United States interest in the ship and its safety. Furthermore, HERCULES was plying the United States domestic trade, transporting oil from one part of the United States to another part of the United States pursuant to a contract that called for payment in the United States. Of course, Argentina was also aware of the obvious United States interest in protecting the freedom of the high seas.

Argentina, as a member of the community of nations, has naturally benefited from the freedom of the seas guaranteed by international law and the law of the United States. Obviously, Argentina has ready means to defend the suit here, and, if the United States declines to exercise personal jurisdiction, the substantive policies of the international law involved will be undermined. Considerations of fairness also weigh in favor of exercising jurisdiction since appellants have sought redress of their grievances in Argentina and were unable to obtain even a hearing. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). Accordingly, we find that there is no constitutional bar to the district court's exercise of personal jurisdiction over Argentina here.

## VI.   Conclusion

Our holding today is a narrow one. The FSIA is the sole source from which a foreign sovereign may obtain immunity and, ordinarily, it is the only basis on which a court can exercise jurisdiction over a foreign sovereign. However, where an alien sues a foreign sovereign for a violation of international law, Congress has provided subject matter jurisdiction under the Alien

Tort Statute. We realize that the question of the effect of these two statutes enacted by Congress is a difficult one.[2] We are heartened by the knowledge that, if we are mistaken, there is no bar to a statutory remedy. It should also be noted that the burden on a plaintiff moving under the Alien Tort Statute remains great. The class of actions that are recognized as international law violations, as distinguished from a mere tort, is quite small. Moreover, the sovereign defendant or its action must have sufficient contacts to satisfy the constitutional requirements of personal jurisdiction. And finally, the procedural requirements of the FSIA, restricting execution of judgment for example, see *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir.1984), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985) would still have to be considered. See Kane, Suing Foreign Sovereigns: A Procedural Compass, 34 Stan.L.Rev. 385, 392–93 (1985).

The judgment of the district court is reversed and the case is remanded for further proceedings.[3]

KEARSE, Circuit Judge, dissenting:

I respectfully dissent from the majority's conclusion that the district court has subject matter jurisdiction over the present suit to recover money damages from defendant Argentine Republic ("Argentina") for its bombing of a Liberian tanker in international waters some 600 miles from the Argentine coast. In my view, the majority has disregarded a clear Congressional intention to deny United States courts jurisdiction over such matters where, as

here, the foreign state asserts a defense of sovereign immunity.

The majority holds that Argentina is not entitled to recognition of its claim of sovereign immunity, and thereby to have the case dismissed for lack of jurisdiction, because the Alien Tort Statute, codified at 28 U.S.C. § 1350 (1982), provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort ... committed in violation of the law of nations...." The majority views this provision as "no more than a jurisdictional grant based on international law," and rules that the scope of the grant depends on "[t]he evolving standards of international law." *Ante* at 425. I disagree.

At the outset, it should be recognized that though substantive international law is part of the common law of the United States, *see Filartiga v. Pena-Irala*, 630 F.2d 876, 887 (2d Cir.1980), federal court subject-matter jurisdiction is not a matter of common law. Such jurisdiction exists only to the extent that Congress has bestowed it, "in the exact degrees and character which to Congress may seem proper for the public good." *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845) (footnote omitted); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850). Thus, even assuming that when Congress passed the Alien Tort Statute in 1789 it intended to allow federal subject-matter jurisdiction to ebb and flow with the vicissitudes of "evolving standards of international law," a premise of which I am skeptical, I cannot see how we can properly disregard the clearly restrictive provisions of the Foreign

---

2. Other district courts that have directly considered these questions have reached varying conclusions. See *Von Dardel v. Union of Soviet Socialist Republics*, 623 F.Supp. 246 (D.D.C. 1985) (finding jurisdiction); *In re Korean Airlines Disaster of September 1, 1983*, MDL No. 565, Misc. No. 83–0345 (D.D.C. Aug. 2, 1985) (finding no jurisdiction); *Siderman v. The Republic of Argentina*, (CV82–1772–RMT MCX) (C.D.Cal. March 7, 1985) (finding no jurisdiction). We are informed that further proceedings are pending in *Von Dardel* and *Siderman*. Cf. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

3. Appellants also argue that jurisdiction exists here under § 1605(a)(5) of the FSIA on the grounds that sinking a ship on the high seas is a tort "within the United States" and that disruption of contractual payments due in New York is an "injury occurring in the United States." See *Texas Trading & Milling Corp.*, 647 F.2d at 312. In view of our disposition of this case, we need not consider these issues. We do note, however, that these arguments are not inconsistent with our holding, since a court could find jurisdiction for a tort under the FSIA, without deciding whether the tort is a violation of international law.

Sovereign Immunities Act ("FSIA") passed in 1976, codified at 28 U.S.C. §§ 1330, 1602–1611 (1982), which were "intended to preempt any other State or Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns." H.R.Rep. No. 1487, 94th Cong., 2d Sess. ("House Report"), *reprinted in* 1976 U.S.Code Cong. & Admin.News ("USCCAN") 6604, 6610.

Section 1602 of the FSIA provides that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter [*i.e.,* 28 U.S.C. §§ 1602–1611]." To me, the plain language of this provision means that the FSIA established the exclusive framework within which the courts of the United States were, from 1976 onward, to rule on foreign states' claims of sovereign immunity.

If further clarification be required, the legislative history of the FSIA is replete with it. For example, the Report of the House of Representatives Judiciary Committee, in addition to stating that the FSIA was intended to preempt any other law with regard to foreign sovereign immunity, stated that the FSIA "sets forth the *sole and exclusive standards* to be used in resolving questions of sovereign immunity raised by foreign states before Federal and State courts in the United States." House Report, 1976 USCCAN at 6610 (emphasis added). *See also id.* at 6604 (FSIA's purpose was "to define the jurisdiction of United States courts in suits against foreign states [and] the circumstances in which foreign states are immune from suit"); *id.* (FSIA was designed "to provide when a foreign state is entitled to sovereign immunity"); *id.* at 6613 (FSIA "sets forth the legal standards under which Federal and State courts would henceforth determine all claims of sovereign immunity raised by foreign states"); *id.* at 6610 ("setting forth comprehensive rules governing sovereign immunity, the [FSIA] bill prescribes: the jurisdiction of U.S. district courts in cases involving foreign states ..."); *id.* at 6611 (the bill added 28 U.S.C. § 1330, which

"provides a comprehensive jurisdictional scheme in cases involving foreign states").

It is hardly surprising, therefore, that the United States Supreme Court has noted that the FSIA "contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983) ("*Verlinden*").

Looking to the substantive provisions of the FSIA, I see no basis for denying Argentina's claim of sovereign immunity in the present case. Section 1604 states, in pertinent part, that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Thus, the FSIA "starts from a premise of immunity and then creates exceptions to the general principle." House Report, 1976 USCCAN at 6616. "[I]f the claim does not fall within one of the exceptions, federal courts lack subject-matter jurisdiction." *Verlinden,* 461 U.S. at 489, 103 S.Ct. at 1969 (footnote omitted). The exceptions created in §§ 1605–1607 center principally on the foreign state's conduct of commercial activities, plainly not at issue in the present case, and on noncommercial torts committed within the United States (*see* House Report, 1976 USCCAN at 6619: "the tortious act or omission must occur within the jurisdiction of the United States ..."), a condition also plainly not met here.

Finally, it is evident that in enacting the FSIA, Congress did consider and make provision with respect to claims of alleged violations of international law. Thus, the House Report noted that in only "two categories of cases [would § 1605(a)(3) ] deny immunity where 'rights in property taken in violation of international law are in issue.'" House Report, 1976 USCCAN at 6618. The two categories involve cases where the property (or property exchanged for it) either (a) is present in the United States, or (b) is owned or operated by the foreign state claiming immunity. 28 U.S.C.

§ 1605(a)(3). Neither circumstance is present here.

In sum, I believe it clear from both the statutory language and the legislative history that (1) the FSIA provides the exclusive framework within which the courts of the United States are to resolve a foreign state's claim of sovereign immunity, and (2) within that framework, recognition of such immunity is to be the rule, subject only to such exceptions as are expressly provided in the statute. Since the FSIA does not set forth any exception denying immunity in a case such as the present one, I would affirm the judgment of the district court dismissing this action.