**Barry J. MARTIN, Appellant,**

v.

**The REPUBLIC OF SOUTH AFRICA, Transvaal Department of Hospital Services, d/b/a H.F. Verwoerd Hospital and Paul Kruger Hospital, Appellees.**

Nos. 259, 341, Dockets 87–7425, 87–7457.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1987.

Decided Dec. 29, 1987.

William T. Lake, Washington, D.C. (John Payton, Janell M. Byrd, Maxwell O. Chibundu, and Wilmer, Cutler & Pickering; Alice Callopy, and Pegalis and Wachsman; and Gay J. McDougal, National Lawyers' Committee for Civil Rights Under Law, Washington, D.C., on the brief), for appellant.

Filip L. Tiffenberg, New York City (Bolan, Lang, Biancone & Tiffenberg, New York City, on the brief), for appellees.

Before TIMBERS, MESKILL and PRATT, Circuit Judges.

TIMBERS, Circuit Judge:

Barry J. Martin ("appellant") appeals from a judgment entered April 23, 1987, in the Southern District of New York, Charles E. Stewart, Jr., *District Judge,* dismissing for lack of subject matter jurisdiction his complaint against the Republic of South Africa, the Transvaal Department of Hospital Services, d/b/a H.F. Verwoerd Hospital and the Paul Kruger Hospital (collectively "appellees" or "South Africa"). The critical issue presented is whether South Africa's alleged tortious conduct caused a "direct effect in the United States" within the meaning of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–11 (1982) ("FSIA" or the "Act"), so that the district court had subject matter jurisdiction. We agree with the district court that it did not. We affirm.

## I.

We summarize only those alleged facts believed necessary to an understanding of the issue raised on appeal.

Barry J. Martin is a black United States citizen and a resident of the State of New York, Queens County. The Transvaal Department of Hospital Services is a medical care service owned and operated by the Republic of South Africa. It is located in Transvaal, South Africa. The H.F. Verwoerd Hospital and the Paul Kruger Hospital are both owned and operated by the Transvaal Department of Hospital Services. The H.F. Verwoerd Hospital is located in Pretoria, South Africa. The Paul Kruger Hospital is located in Rustenburg, South Africa.

In July 1983, Martin, a professional dancer, traveled with the "Hot Gossip Dance Group" through South Africa to perform in Sun City, South Africa. On September 26, 1983, Martin was injured in a one-car accident while traveling in South Africa. The car, driven by Martin's companion, Peter Pink, went off the road and overturned several times, coming to rest on its roof. After the accident, an ambulance operated by the Transvaal Department of Hospital Services arrived at the scene and transported Pink to the Paul Kruger Hospital where he was treated. Martin was left at the scene of the accident, allegedly because he was black.

Martin later was transported to the Paul Kruger Hospital in a private automobile. He allegedly was forced to walk into the hospital where he waited several hours expecting to receive medical care. He was never admitted to the Paul Kruger Hospital and received no medical care there. Instead, Martin was transferred to the H.F. Verwoerd Hospital, 65 miles away in Pretoria, South Africa. Martin alleges that he became quadriplegic during this transfer.

Upon arriving at the H.F. Verwoerd Hospital, Martin was diagnosed as quadriplegic. After more than 24 hours at this hospital, he received medical treatment for the first time, but only after being granted "honorary White status". Martin's cervical spine was stabilized by a fusion proce-dure. He remained at H.F. Verwoerd from September 26, 1983 until November 15, 1983, when he was transferred to the National Spinal Injury Center of Stake Mandeville Hospital in Aylesbury, England. Martin remained in England until September 15, 1984.

On December 18, 1984, Martin commenced this action in the Southern District of New York against the Republic of South Africa and the Transvaal Department of Hospital Services, d/b/a H.F. Verwoerd Hospital and Paul Kruger Hospital, alleging that he was denied emergency medical service because he was black. Martin claimed that the denial of immediate medical care aggravated existing injuries caused by the accident and constituted negligence and medical malpractice. Martin demanded $80,000,000 in compensatory damages and $20,000,000 in punitive damages.

On June 18, 1985, the Republic of South Africa and the Transvaal Department of Hospital Services, d/b/a H.F. Verwoerd and Paul Kruger Hospitals filed a motion to dismiss the complaint on the grounds that (1) the district court lacked subject matter and personal jurisdiction, (2) the Southern District of New York was an inconvenient forum, and (3) the action was barred by the act of state doctrine. On April 16, 1987, the court filed a well reasoned opinion granting the motion to dismiss the complaint on the grounds that the court lacked subject matter jurisdiction and personal jurisdiction over the defendants. The court held that South Africa was entitled to sovereign immunity under the FSIA in that South Africa's acts did not cause a "direct effect in the United States" within the meaning of § 1605(a)(2) of the Act. This appeal followed.

Before turning to the issue of the application of the FSIA to the instant case, we must bear in mind what the district court did *not* decide. It did not decide whether South Africa's conduct was in connection with commercial activity. Nor did the court reach the issues of whether the complaint should be dismissed on the grounds of *forum non conveniens* or the act of state doctrine. These issues of course are not raised on this appeal.

Appellant's sole claim on appeal is that a foreign sovereign's conduct, which injures an American outside the jurisdiction of the United States and results in his returning to the United States permanently disabled, causes a "direct effect in the United States" within the meaning of the FSIA, thereby stripping the foreign sovereign of immunity. For the reasons that follow, we reject this claim.

## II.

Congress enacted the FSIA in 1976 to codify procedures for actions commenced against foreign states in the United States. The Act provides a comprehensive set of guidelines as to when and how parties may maintain an action against a foreign state in the courts of the United States and when a foreign state is entitled to sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604 ("House Report"). Prior to the enactment of the FSIA, when a foreign state was sued in the United States it was incumbent upon that state to request the Department of State to make a formal suggestion of immunity to the court if that state wished to assert immunity. *Id.* at 6606. Congress, in enacting the FSIA, "transfer[red] the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations...." *Id.* See also *Amerada Hess Shipping Corp. v. Argentine Republic,* 830 F.2d 421, 426–27 (2 Cir.1987).

The provision for subject matter and personal jurisdiction in actions against foreign states in the courts of the United States is found in 28 U.S.C. § 1330 (1982) which provides in relevant part:

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a)...."

For there to be original jurisdiction, however, the claim against the foreign state must fall within an exception to the basic premise, set forth in 28 U.S.C. § 1604 (1982), that foreign states generally are immune from the jurisdiction of federal and state courts. Section 1604 provides:

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

*See The Exchange v. M'Faddon,* 11 U.S. (7 Cranch) 116, 136 (1812).

The specific exception involved on this appeal is 28 U.S.C. § 1605(a)(2) (1982), which provides in relevant part:

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(2) in which an action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]"

The focus of our inquiry is to determine whether appellees' acts caused a "direct effect in the United States" within the meaning of § 1605(a)(2), i.e., whether the effect was sufficiently "direct" and sufficiently "in the United States" to support the claim of the foreign state to sovereign immunity.

The legislative history is not particularly helpful in defining the phrase "direct effect in the United States". For example, the only reference in the House Report to this provision states that § 1605(a)(2) embraces "commercial conduct abroad having direct effects within the United States which would subject such conduct to the exercise of jurisdiction by the United States consistent with principles set forth in section 18, Restatement of the Law, Second, Foreign Relations Law of the United States (1965)." House Report at 6618. The reference in

the House Report to section 18 of the Restatement of Foreign Relations Law strikes us as inapposite. It more appropriately might be characterized as a proposed long-arm provision. It surely does not address the problem of actions brought against foreign states in the courts of the United States. In *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 311 (2 Cir.1981), *cert. denied,* 454 U.S. 1148 (1982), we held that courts construing the "direct effect" clause should not be constrained to follow the "substantial" and "foreseeable" factors of section 18 of the Restatement since the latter was concerned with entirely different matters than those to which the FSIA is directed. We reaffirm our views set forth in *Texas Trading* and rely on the plain language of the statute and relevant case law to interpret the meaning of "direct effect in the United States". *Accord, Zernicek v. Brown & Root, Inc.,* 826 F.2d 415, 417 (5 Cir.1987) ("[Section 18], however, does not on its face relate to sovereign immunity but rather concerns the extent to which a state may enact substantive rules of law governing conduct outside its territory that has effects within its territory.")

In *Texas Trading,* we interpreted the "direct effect" clause of § 1605(a)(2). There, three American companies entered into contracts with Nigeria under which the companies were to ship cement to Nigeria in exchange for payments to be received through a New York bank. When Nigerian ports became blocked, Nigeria repudiated the contracts. The companies commenced actions against Nigeria in the United States. We concluded that the district court had subject matter jurisdiction. We held that the term "direct" was satisfied since the companies had sustained a "financial loss" in the United States. We also held that the term "in the United States" was satisfied since the companies were to present documents and collect money in the United States, but the breach by Nigeria precluded them from doing so. 647 F.2d at 312.

Appellant asserts that the result reached in *Texas Trading* should apply to the instant case where a foreign government, engaged in commercial activities, has inflicted personal injuries on an American citizen abroad. He argues that the phrase "direct effect in the United States", as construed by us in *Texas Trading,* is satisfied here since the foreign sovereign caused an American citizen to return to the United States permanently disabled, subject to continuing medical complications, and dependent on government aid for his subsistence. He further argues that the effects of the acts of South Africa were sufficiently "direct" and sufficiently "in the United States" so that the district court had subject matter jurisdiction. We disagree.

In *Texas Trading,* we held that the effect of Nigeria's acts was "in the United States" because the financial loss to American companies occurred here. In the instant case, unlike *Texas Trading,* the effects of the foreign state's acts occurred outside the United States, in South Africa, where appellant sustained personal injuries. In *Texas Trading,* we stated that when Americans sustain personal injuries overseas it was "easy to locate the 'effect' outside the United States." 647 F.2d at 312 n. 35. Unlike *Texas Trading,* where no injury was sustained until American companies were denied payment in the United States from a New York bank, the injury to appellant occurred in South Africa where he became quadriplegic. Upon the authority of *Texas Trading,* it cannot be said that the effects of South Africa's acts occurred "in the United States".

The Fifth Circuit in *Zernicek v. Brown & Root, Inc., supra,* recently has interpreted the "direct effect" clause of § 1605(a)(2). There, an agency of the government of Mexico (Pemex) was conducting mineral exploration in the Bay of Campeche. It contracted with an American company for its support services. Zernicek, a United States citizen and an employee of the American company, was exposed to excessive doses of radiation as a result of the negligence of Pemex. After returning to the United States, Zernicek suffered continued sickness from the effects of his exposure. The issue before the court was whether the physical suffering and substantial medical expenses incurred by Zernicek after his return to the United States

constituted a "direct effect in the United States". In holding that it did not, the court stated:

"Congress' use of the term 'direct' in the Act was obviously intended to invoke the court's judgment. The distinction between an effect that is 'direct' and one that is indirect is not quantitative and cannot be programmed into a computer. The district court properly followed the cases holding that the eventual effect in the United States of the personal injury or death of an American citizen while abroad is not direct within the meaning of the Act...."

826 F.2d at 419.

Here, appellant makes substantially the same claim as the appellant did in *Zernicek*. Appellant here asserts that, where South Africa's activities have caused a citizen to return to the United States permanently disabled, the foreign state has caused a "direct effect in the United States". We disagree. We find the analysis of the *Zernicek* court to be persuasive.

Our holding on the issue raised on this appeal conforms with the holdings of all courts that have considered a claim for *personal injuries* sustained in a foreign state when the plaintiff asserted that the "direct effect in the United States" was the continued physical suffering and consequential damages that persisted once the plaintiff returned. For example, in *Tucker v. Whitaker Travel, Ltd.*, 620 F.Supp. 578 (E.D.Pa.1985), *aff'd mem.*, 800 F.Supp. 1140 (3 Cir.), *cert. denied*, 107 S.Ct. 578 (1986), the plaintiff sued the Commonwealth of the Bahamas and the Ministry of Tourism for injuries he sustained while riding horseback in the Bahamas. The district court dismissed the action for lack of subject matter jurisdiction. The court held that:

"The direct effects of the various defendants' tortious conduct are plaintiffs' injuries, which occurred outside the United States. Whatever pain and pecuniary loss plaintiffs suffer in the United States are indirect consequences of the accident in the Bahamas."

620 F.Supp. at 586.

Likewise, in *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem.*, 607 F.2d 494 (D.C.Cir.1979), the court held that subject matter jurisdiction was absent. There, an action was brought against the Empire of Iran and Iran's Department of Civil Aviation, as owner and operator of an airport, for personal injuries sustained as the result of the collapse of the roof at Mehrabad International Airport in Tehran. The district court, holding that no direct effects were caused in the United States by the defendants' negligent operation and maintenance of the Mehrabad Airport, stated:

"The common sense interpretation of a 'direct effect' is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."

459 F.Supp. at 266. The court also stated that, although the effects of the plaintiff's injuries may be endured in the United States, the injury itself was caused in Tehran. *Id.*

At oral argument before us, appellant's counsel recognized the number of opinions contrary to the position he advocated. He argued that these opinions incorrectly applied the statute and created an anomaly between the treatment of corporations and the treatment of individuals under the "direct effect" provision. We disagree.

We do not believe that such a distinction exists, nor do we create one here. Appellant was not in the United States at the time of the accident. He was in South Africa. Indeed, he did not return to the United States until more than a year after the date of the accident. Application of the plain language of § 1605(a)(2) leads us to conclude that South Africa's conduct did not cause a direct effect in the United States. Appellant nevertheless invites us to interpret § 1605(a)(2) so as to conclude that there is subject matter jurisdiction in this case. We decline the invitation.

We note that in supplemental briefs requested by the Court the parties agree that this Court's recent opinion in *Amerada Hess Shipping Corp. v. Argentine Republic, supra*, does not remove this case from the coverage of the FSIA. Since Martin and South Africa agree that *Amerada Hess* does not apply to this case, although

they do so for different reasons, we decide this case under the terms of the "direct effects" exception contained in the FSIA, and leave for another day the question of whether under *Amerada Hess* claimed violations of international law that are outside the scope of the Alien Tort Claims Act are governed by the FSIA's framework for deciding claims of foreign sovereign immunity.

### III.

To summarize:

We hold that South Africa's acts did not have a "direct effect in the United States" within the meaning of § 1605(a)(2) of the FSIA, and that the district court therefore correctly dismissed the complaint for lack of subject matter jurisdiction.

Affirmed.