09-0478-cv

Guirlando v. T.C. Ziraat Bankasi A.S.

09-0478-cv
Guirlando v.
T.C. Ziraat
Bankasi A.S.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: October 23, 2009          Decided: April 8, 2010)

Docket No. 09-0478-cv

_____

THERESA GUIRLANDO*,

Plaintiff-Appellant,

- v. -

T.C. ZIRAAT BANKASI A.S.,

Defendant-Appellee.

_____

Before: JACOBS, Chief Judge, KEARSE, Circuit Judge, and GARDEPHE,

District Judge**.

Appeal from final judgment and order of the United States

District Court for the Southern District of New York, Richard J.

_____

* Although in the notice of appeal, as well as in the briefs filed in this Court, plaintiff's name is spelled "Giurlando," which matches the spelling on reproductions of her driver's license and passport in the record, her name is spelled "Guirlando" in her original complaint and in the orders issued by the district court. "Because legal research catalogs and computers are governed by the principle of consistency, not correctness, we feel constrained to adhere to the erroneous spelling." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 555 n.* (1980).

** Honorable Paul G. Gardephe, of the United States District Court for the Southern District of New York, sitting by designation.

Sullivan, Judge, dismissing, for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, see 28 U.S.C. §§ 1330(a), 1605(a)(2), plaintiff's claims against defendant Turkish bank for conduct in Turkey enabling the theft of moneys from her Turkish bank account.

Affirmed.

V. ELIZABETH GRAYSON, New York, New York, for Plaintiff-Appellant.

MICHAEL T. SULLIVAN, New York, New York (Sullivan & Worcester, New York, New York, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiff Theresa Guirlando ("Guirlando") appeals from a final judgment of the United States District Court for the Southern District of New York, Richard J. Sullivan, Judge, dismissing her claims against defendant T.C. Ziraat Bankasi A.S., a Turkish bank ("Ziraat" or the "Bank"), for, inter alia, negligence, negligent and intentional misrepresentations and omissions, and breach of fiduciary duty in enabling Guirlando's husband to withdraw most of her life savings from a newly established bank account in Turkey. The district court granted Ziraat's motion pursuant to Fed. R. Civ. P. 12(b)(1) and provisions of the Foreign Sovereign Immunities Act ("FSIA" or the "Act"), see 28 U.S.C. §§ 1330(a), 1603-1605, to dismiss the action for lack of subject matter jurisdiction, finding that Ziraat is an agency or instrumentality of a foreign state within the meaning of

- 2 -

the Act and is immune from this suit because the acts on which Guirlando's claims were based did not "cause[] a direct effect in the United States," 28 U.S.C. § 1605(a)(2). On appeal, Guirlando contends that the district court erred in concluding that Ziraat's acts did not cause a direct effect in the United States. For the reasons that follow, we reject Guirlando's contentions and affirm the judgment of the district court.

I. BACKGROUND

The status of Ziraat as an instrumentality of the government of Turkey is not disputed. The following description of the events on which Guirlando's claims are based is drawn from the allegations of the amended complaint ("Complaint"), which are accepted as true for purposes of reviewing this Rule 12(b)(1) dismissal.

A. The Events

In Port Jefferson, New York, in October 2006, Guirlando, a 67-year-old United States citizen, married Mevlut Cicek, a citizen of Turkey who was not legally present in the United States. In March 2007, Cicek disappeared without notice. He thereafter telephoned Guirlando, explained that he had been deported to Turkey, and asked her to move to Turkey to join him. Guirlando sold her house and car; in May 2007 she flew to Turkey, bringing a check drawn on a New York branch of Citibank payable to herself in

the amount of $251,156.63, representing the proceeds from those sales and the entire balance of her Citibank account--in essence, her "life savings." (Complaint ¶ 8.)

When Guirlando arrived in Cicek's home town of Adana, Turkey, Cicek took her to the Adana branch of Ziraat, where he was "well known to the Manager and other executive level personnel." (Id. ¶ 9.) Guirlando informed English-speaking employees of Ziraat that she wished to open an individual account and deposit her check into it. She alleges that the Bank employees told her, falsely, that she could not open an account without a Turkish identification number; they thus persuaded her to open a joint account with Cicek. In addition, without informing Guirlando of the availability of an account from which withdrawals could be made only by the owners jointly, the Ziraat employees had her sign forms and signature cards for a joint account of a "disjunctive character," allowing withdrawals to be made by one owner without the consent of the other. (Id. ¶ 11.) The forms and signature cards were entirely in Turkish, and Guirlando was unaware that her money could be withdrawn from the account without her signature.

The Ziraat employees promised to telephone Guirlando as soon as the deposited funds became available; instead, once the funds had arrived, they informed Cicek. Cicek promptly went to the Bank and commenced withdrawing money from the account; he withdrew more than $200,000 in a series of transactions completed in a single day. (See id. ¶ 16.)

- 4 -

"While Cicek was at Ziraat Bank withdrawing the funds, Cicek's adult daughter informed G[ui]rlando that Cicek had gone to the bank to steal her money." (Complaint ¶ 17.) After the Bank confirmed that Cicek had made withdrawals, Guirlando promptly withdrew the remaining balance, approximately $50,000. She subsequently returned to the United States and commenced the present action against Ziraat.

In addition to the above allegations, Guirlando alleged on information and belief

> that at the time when she opened her Ziraat Bank account, the manager and executive personnel at Ziraat Bank knew that Cicek was a criminal and a swindler, and that his marriage to G[ui]rlando was bigamous and void because Cicek was already married to a Turkish woman when he married G[ui]rlando. The Ziraat employees expected to profit from Cicek defrauding G[ui]rlando.

(Id. ¶ 19.) The Complaint asserted that, as a result of the conduct of Ziraat's employees with respect to the opening of the account for the deposit of Guirlando's check, the Bank was liable for negligence, negligent and intentional misrepresentations and omissions, breach of the covenants of good faith and fair dealing, and breach of fiduciary duty.

B. _Ziraat's Motion To Dismiss and the Ruling of the District Court_

Ziraat moved to dismiss the Complaint on various grounds, including lack of subject matter jurisdiction. In support of its motion, it submitted a declaration by its First Legal Counsel stating, _inter alia_, that Ziraat is a joint-stock company wholly owned by the government of Turkey (see Declaration of Yurdagül

- 5 -

Rüzgar dated February 8, 2008, ¶ 2), and that its historical roots "date back to the Ottoman Empire when it was formed as the first agricultural financial institution founded and guaranteed by the state" (id. ¶ 4). Ziraat argued, inter alia, that it is thus an instrumentality of a foreign state and hence entitled to immunity under the FSIA. Guirlando did not dispute Ziraat's status as an instrumentality of a foreign state within the meaning of the FSIA; but she argued that Ziraat lacked immunity under that statute because the actions of the Bank's employees caused a direct effect in the United States by causing the payment of approximately a quarter of a million dollars from Guirlando's Citibank account in New York.

In an Order of Dismissal dated December 15, 2008, the district court granted Ziraat's motion to dismiss for lack of subject matter jurisdiction under the FSIA. See Guirlando v. T.C. Ziraat Bankasi, A.S., No. 07 Civ. 10266, 2008 WL 5272195 (S.D.N.Y. Dec. 15, 2008) ("Guirlando"). The court rejected Guirlando's contention that Ziraat's actions had a direct effect in the United States. It noted that this Court had ruled that the FSIA's "'commercial activity'" exception did not apply where "'all legally significant acts'" took place in the foreign country and the only alleged "'direct effect'" in the United States was "'[t]hat the money came from a bank account in New York.'" Id. at *4 (quoting Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993), cert. denied, 510 U.S. 1071 (1994)). Here, instead, the district court found that "all

- 6 -

'legally significant' acts" by Ziraat "took place in Turkey, where Plaintiff opened the joint bank account, and where all of [Ziraat's] allegedly unlawful behavior occurred," Guirlando, 2008 WL 5272195, at *4. The court concluded that "the sole act connected to the United States in the instant matter, the drawing of a check on a bank in New York, is not legally significant, as it was entirely fortuitous and entirely unrelated to the liability of [Ziraat]," id. (internal quotation marks omitted).

Judgment was entered dismissing the Complaint. Guirlando's motion for reconsideration pursuant to Fed. R. Civ. P. 59(e) and 60(b) was denied, and this appeal followed.

## II. DISCUSSION

On appeal, Guirlando challenges the judgment of dismissal (as well as the denial of her motion for reconsideration--although she proffers no separate arguments as to that denial), contending principally that either the "payment of the $251,156.63 out of the New York Citibank account" (Guirlando brief on appeal at 35) or her impoverishment "as an American citizen" (id. at 41; see also Guirlando reply brief on appeal at 6-7) constitutes a direct effect in the United States sufficient to meet this Court's "legally significant act" test. Alternatively, she urges this Court to abandon the "legally significant act" test and rule that the Citibank payment or her impoverishment constitutes the

requisite direct effect. (See Guirlando brief on appeal at 37-38, 45; Guirlando reply brief on appeal at 18-19.)

Given the absence of any dispute as to the status of Ziraat as a foreign state within the meaning of the FSIA, see 28 U.S.C. §§ 1603(a) and (b), and Ziraat's acceptance of the allegations of the Complaint as true for purposes of its Rule 12(b)(1) motion, Guirlando's contentions present only questions of law, which we review de novo. See generally Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 235 (2d Cir. 2002) ("Virtual Countries"). For the reasons that follow, we reject Guirlando's contentions.

A.   The FSIA Meaning of "Direct Effect in the United States"

The FSIA "'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). The Act provides, in general, that the federal district courts have subject matter jurisdiction over "any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a) (emphasis added).

Section 1605(a)(2), known as the "commercial activity exception", provides that

- 8 -

> (a) A foreign state <u>shall not be immune</u> from the jurisdiction of courts of the United States or of the States <u>in any case</u>--
>
>     . . . .
>
> > (2) <u>in which the action is based</u> [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] <u>upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere **and that act causes a direct effect in the United States**</u> . . . .

28 U.S.C. § 1605(a)(2) (emphases added). The phrase "'based upon[]' . . . . is read most naturally" to introduce "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." <u>Nelson</u>, 507 U.S. at 357 (construing first clause of § 1605(a)(2)). As is plain from the language of the section, each of its three clauses describes different categories of conduct for which the foreign state is denied immunity. Only the third clause is at issue here.

To be a "direct" effect within the meaning of the third clause of the commercial activity exception, the impact need not be either substantial or foreseeable, <u>see</u> <u>Republic of Argentina v. Weltover, Inc.</u>, 504 U.S. 607, 617-18 (1992) ("<u>Weltover II</u>"), <u>aff'g</u> 941 F.2d 145 (2d Cir. 1991) ("<u>Weltover I</u>"); rather, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity,'" <u>Weltover II</u>, 504 U.S. at 618 (quoting <u>Weltover I</u>, 941 F.2d at 152). In <u>Weltover I</u>, we indicated that, by "immediate," we meant that, between the foreign state's commercial activity and the effect, there was no

- 9 -

"intervening element." 941 F.2d at 152; see also Martin v. Republic of South Africa, 836 F.2d 91, 95 (2d Cir. 1987) ("Martin") ("The common sense interpretation of a 'direct effect'" within the meaning of § 1605(a)(2) "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." (other internal quotation marks omitted)). We have held that "the requisite immediacy" is lacking where the alleged effect "depend[s] crucially on variables independent of" the conduct of the foreign state. Virtual Countries, 300 F.3d at 238.

This Circuit's reference to a "legally significant act" test had its origin in an effort to determine whether the direct impact of a foreign state's foreign commercial activity was felt "in the United States." In Weltover I, a breach-of-contract suit against the Republic of Argentina for unilaterally extending the time for payments on bonds it had issued, brought by bondholders who had designated New York as the place of payment, we began our inquiry as to situs by stating that

> [i]n determining where the effect is felt directly, courts often look to the place where legally significant acts giving rise to the claim occurred. See Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511, 1515 (D.C.Cir.1988) (legally significant event must occur in the United States). We have stated that "[a]n injury to a corporation occurs in some legally significant situs, for instance, . . . a place designated for performance of a contract."

Weltover I, 941 F.2d at 152 (quoting International Housing Limited v. Rafidain Bank Iraq, 893 F.2d 8, 11 n.3 (2d Cir. 1989) ("International Housing")). We concluded that whereas there was

no FSIA jurisdiction over the contract dispute in International Housing "based, in large measure, on the fact that '[p]ayment in New York City was not a contractual requirement,'" Weltover I, 941 F.2d at 152-53 (quoting International Housing, 893 F.2d at 12), there was FSIA jurisdiction in Weltover I because

> the contract gave plaintiffs the option to call for payment in New York. Plaintiffs exercised that option. The legally significant act was defendants' failure to abide by the contractual terms; i.e., to make payments in New York. The effects occurred, in the first instance, in New York, when the plaintiffs' accounts were not credited with the outstanding amount of U.S. dollars. As such, the act of nonpayment caused a direct effect in the United States.

941 F.2d at 153 (emphases added).

Thus, in ruling that a "legally significant act" occurred in the United States, Weltover I meant that, because the contracts required payment to be made in the United States, the nonpayment constituting the breach occurred in the United States. See also Virtual Countries, 300 F.3d at 239 ("[A]n anticipatory contractual breach occurs 'in the United States' for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there."). Our conclusion in Weltover I that a foreign state's failure to make payment in the United States as required by contract caused a direct effect in the United States within the meaning of § 1605(a)(2) was affirmed by the Supreme Court in Weltover II, 504 U.S. at 617-19, albeit without comment on our use of the "legally significant act" language.

- 11 -

In the meantime, prior to the decision in <u>Weltover II</u>, the "legally significant act" formulation used in <u>Weltover I</u>, was used in <u>Antares Aircraft, L.P. v. Federal Republic of Nigeria</u>, 948 F.2d 90 (2d Cir. 1991) ("<u>Antares I</u>"), <u>vacated and remanded for reconsideration in light of Weltover II by</u> 505 U.S. 1215 (1992). <u>Antares I</u> was an action for conversion, brought by a United States partnership whose sole asset was an airplane that had been detained for some five months by an instrumentality of the Federal Republic of Nigeria and was not released until Antares paid airport parking and landing fees allegedly owed by Antares's lessee. In affirming dismissal of the action for lack of subject matter jurisdiction, we noted that the detention undoubtedly had a direct effect on Antares; but as "<u>the 'legally significant act'</u>--the detention and alleged conversion of the aircraft--<u>occurred in Nigeria</u>," we concluded that "<u>the effect</u> of the defendants' conduct abroad was not felt directly 'in the United States,' but in Nigeria." <u>Antares I</u>, 948 F.2d at 95 (emphases added).

The "legally significant <u>act</u>" (emphasis added) formulation has caused some confusion both from a statutory interpretation standpoint and--principally in the breach-of-contract context--from a metaphysical standpoint. First, interpreting the third clause of § 1605(a)(2)--which denies a foreign state immunity for a claim "based . . . upon <u>an act outside</u> the territory of the United States in connection with a commercial activity of the foreign state elsewhere and <u>that</u> act causes a direct effect in the United States" (emphases added)--to mean that the foreign state

must have performed some legally significant act "in" the United States would conflate the provisions of the third clause with those of the second clause of that section. The second clause expressly denies immunity to a foreign state for "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," § 1605(a)(2) (emphasis added). Since "[d]istinctions among descriptions juxtaposed against each other are naturally understood to be significant," Nelson, 507 U.S. at 357, we do not interpret the "legally significant act" test as one requiring that the foreign state have "performed" an act "in the United States."

Second, the metaphysical conundrum posed by Weltover I's suggestion that, in order to be denied immunity under the third clause of § 1605(a)(2), a foreign state must have performed a legally significant "act" "in the United States" is that that formulation equated acts with omissions. Thus, when Weltover I stated that the legally significant "act" depriving the Republic of Argentina of immunity "was defendants' failure to abide by the contractual terms"--i.e., the "act of nonpayment"--941 F.2d at 153 (emphases added), its shorthand phrasing equated an act with a non-act. And although some cases state, with respect to such a nonpayment, that "[t]he 'legally significant' act was . . . the breach that occurred in the United States," Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993) ("Antares II") (emphases added), cert. denied, 510 U.S. 1071 (1994), the effect is the same because the reference is to a

"payment [that] was to take place . . . but did not," id. at 35. Thus, the "legally significant act" formulation causes conceptual problems in the context of contract suits, because it conflates an act with the act's effect. The decision by a foreign sovereign not to perform is itself an act, but it is not an act in the United States; it is an act in the foreign state. A decision not to act, standing by itself, does not have an effect until there has been an anticipatory repudiation or a failure to act at the time required. And although the failure to act may have a legally significant effect in the place where the act was to have been performed, the failure to act is not itself an act.

The "legally significant act" formulation poses less of a conundrum in the context of tort actions. In Antares II, following the remand of Antares I for reconsideration in light of Weltover II, we noted that the Supreme Court's opinion in Weltover II had not expressed a view on Weltover I's "legally significant act" formulation but that Weltover II had used a similar analysis in finding it decisive that the contract had been breached in New York, the contractually designated place of performance. See Antares II, 999 F.2d at 36. Focusing on the tort claim brought by Antares for the conversion of its airplane, we noted that "[i]n tort, the analog to contract law's place of performance is the locus of the tort," id. Although recognizing the possibility that a foreign tort could have "sufficient contacts with the United States to establish the requisite 'direct effect' in this country," we concluded that the conversion before

- 14 -

us was not such a tort because all of the "legally significant acts took place in Nigeria."  Id.

> The aircraft was registered in Nigeria.  There is no evidence that the use of the aircraft was related to substantial commerce with the United States.  The detention of, and physical damage to, the plane happened in Nigeria.  The alleged conversion thus occurred in Nigeria.  Moreover, the negotiations over, and the payment of, the outstanding fees occurred in Nigeria and utilized Nigerian currency.
>
> <u>That the money came from a bank account in New York is a fact but one without legal significance to the alleged tort</u>.  The Nigerian authorities were indifferent to the geographic location of the source of the money used to pay the fees.  Their demands would have been satisfied had Antares paid from a London checking account or borrowed the funds from a bank in Lagos.  Wherever the source of the money, payment had to be in Nigeria, just as the payment in <u>Weltover</u> had to be in New York.  The tort thus began in Nigeria with the detention of the aircraft and ended in Nigeria with the payment of the money.  Unlike <u>Weltover</u>, where the parties had agreed that performance was to occur in New York, <u>the sole act connected to the United States in the instant matter, the drawing of a check on a bank in New York, was entirely fortuitous and entirely unrelated to the liability of the appellees</u>.

Id. (emphases added).  Thus, we stated that "[u]pon reconsideration, we again affirm [the dismissal] because there was no 'direct effect' of appellees' legally significant conduct in the United States . . . ."  Id. at 34.

We view this last sentence's prepositional phrase "in the United States" as pertaining to "'direct effect'," rather than to "conduct".  That is, the <u>Antares II</u> reconsideration did not state a requirement that (for FSIA jurisdiction) the foreign state must have engaged in conduct in the United States, but rather stated the conclusion that the defendant's legally significant conduct--

- 15 -

all of which occurred in Nigeria--had had no direct effect in the United States. Indeed, our post-Weltover I cases have described our "'legally significant acts' test" as meaning simply that the defendant's conduct that is alleged to have had a direct effect in the United States must be legally significant:

> This test requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply. See Hanil Bank[ v. PT. Bank Negara Indonesia, (Persero)], 148 F.3d [127,] 133[ (2d Cir. 1998)]; see also Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33, 34-35 (2d Cir.1993).

Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 931 (2d Cir. 1998) (emphases added); see also Virtual Countries, 300 F.3d at 240-41. This interpretation is also consistent with tort and contract cases cited in Weltover I.

For example, in Martin, cited in Weltover I for the proposition that in order to be direct, an effect need not be substantial, see Weltover I, 941 F.2d at 152, the plaintiff, a United States citizen, was injured in an accident in South Africa, and he alleged that racially motivated neglect and medical malpractice by employees of a state-owned hospital rendered him a quadriplegic, see Martin, 836 F.2d at 92. We noted that

> the effects of the foreign state's acts occurred outside the United States, in South Africa, where appellant sustained personal injuries. . . . [T]he injury to appellant occurred in South Africa where he became quadriplegic. . . . [I]t cannot be said that the effects of South Africa's acts occurred "in the United States".

Id. at 94. There was no effect in the United States until Martin returned to the United States; and there was no legally

- 16 -

significant act by the foreign state causally connected to that return.

Similarly, in Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511 (D.C. Cir. 1988) ("Zedan"), the case cited by Weltover I in first articulating the "legally significant act" test in this Circuit, the plaintiff, a United States citizen, had entered into a contract in Saudi Arabia to perform services for an agency of that government, the Ministry of Communications, in Saudi Arabia. That agency subsequently refused to pay the agreed compensation, and Zedan returned to the United States unpaid. The Zedan court noted that

> [a]ppellant's injury, while financial rather than personal, was definitely suffered in Saudi Arabia, for it was there that the Ministry of Communications breached its contract with him. While it is true that the breach continued after appellant left Saudi Arabia, the breach's effect in the United States cannot be said to be direct, for this effect is due to an intervening event--appellant's return here.

Zedan, 849 F.2d at 1515. The breach having occurred, its continuation was not legally significant.

These holdings in Martin and Zedan also reflect the principle that the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States. In the Antares litigation, for example, the plaintiff contended that Nigeria's acts had had the requisite direct effect in the United States because Antares was a United States partnership and had suffered

- 17 -

financial loss by having to pay the Nigerian fee demands.  We twice rejected this proposition:

> [T]he direct effect of detaining the plane was . . . the loss of the use of the aircraft and the physical damage it suffered in Nigeria, and not, as Antares alleges, the financial loss that Antares suffered in the United States. . . . The transfer of funds out of Antares' New York bank account, and the resultant financial loss to the partnership, are not by themselves sufficient to place the effect of the defendants' conduct "in the United States" within the meaning of § 1605(a)(2).

Antares I, 948 F.2d at 95 (first emphasis in original; second emphasis ours).  We elaborated in Antares II:

> [T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.  See Martin v. Republic of South Africa, 836 F.2d 91 (2d Cir.1987) (finding that financial injury of person injured abroad is not a "direct effect" in United States); Zernicek v. Brown & Root, Inc., 826 F.2d 415, 418 (5th Cir.1987) ("consequential damages [from personal injury tort abroad] are insufficient to constitute a 'direct effect in the United States' for purposes of abrogating sovereign immunity"), cert. denied, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 862 (1988); Australian Gov't Aircraft Factories v. Lynne, 743 F.2d 672, 675 (9th Cir.1984) (similar), cert. denied, 469 U.S. 1214, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); Colonial Bank v. Compagnie Generale Maritime et Financiere, 645 F.Supp. 1457, 1465 (S.D.N.Y.1986) (finding American bank's loss on ship mortgage from ship seizure to be indirect effect).
>
> If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states.  Many commercial disputes, like the present one, can be pled as the torts of conversion or fraud and would, if appellant is correct, result in litigation concerning events with no connection with the United States other than the citizenship or place of incorporation of the plaintiff.  Similarly, personal injury actions based

- 18 -

on torts with no connection with this country, except for the plaintiff's citizenship, might be brought under appellant's theory. For example, an American citizen injured in a foreign city by a government-owned bus company might sue here if the commercial activity exception is triggered solely by the fact that the citizen's wealth is diminished by the accident. We find it difficult to characterize such an effect, standing alone, as "direct" or to read into this otherwise somewhat restrictive legislation an all-encompassing jurisdiction for foreign torts.

Antares II, 999 F.2d at 36-37 (emphases added). Accord Virtual Countries, 300 F.3d at 240 (the "theory[] that any 'U.S. corporation's financial loss constitute[s] a direct effect in the United States[]' . . . is plainly flawed" (emphasis in original)).


B. Guirlando's Claims

As described in Part I.A. above, Guirlando's Complaint alleges principally that, in Turkey, Ziraat employees (1) told her, falsely, that she could not open an individual checking account into which to deposit her Citibank check, (2) caused her to open a disjunctive joint account from which funds could be withdrawn by one joint owner without the consent of the other, rather than an account for which the consent of both owners would be required for a withdrawal, and (3) notified Cicek, rather than Guirlando, when the funds had arrived in the new Ziraat account. She asserts that these acts had a direct effect in the United States both because they resulted in the payment of $251,156.63 from her New York Citibank account and because she lost more than $200,000 and is an American citizen. Regardless of how the "legally significant act" test is formulated, we cannot conclude

that either event constituted a direct effect in the United States within the meaning of § 1605(a)(2).

Guirlando's contention that the requisite direct effect occurred because she "returned to the United States where she lives in much reduced circumstances" (Complaint ¶ 18) is quickly disposed of for two reasons. First, it is foreclosed by the authorities discussed in Part II.A. above. "[T]he fact that an American individual . . . suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [commercial activity] exception." Antares II, 999 F.2d at 36. Second, Guirlando's financial loss was not a direct result of the Bank's denying her the right to open an individual account, for between that conduct and her impoverishment there was an intervening element, to wit, Cicek's larcenous withdrawals.

We note also that Ziraat's act of notifying Cicek that the funds had arrived in the new Turkish bank account from New York could not have had the requisite direct effect in the United States both because (a) financial injury to a United States citizen is not a legally sufficient effect, and because (b) the funds' arrival in Turkey plainly could not have occurred before the transfer of the funds from the Citibank account in New York, and hence notification of their arrival could not have caused that transfer. Moreover, we cannot see that such a notification had any legal significance. The joint account had been established; the notion that the bank was not entitled to notify one of the

owners of the arrival of funds in the account is not supported by any authority of which we are aware.

Guirlando's contention that the requisite direct effect in the United States consisted of the transfer of the funds out of her New York Citibank account requires somewhat more discussion, but it suffers from multiple flaws. First, we note that her complaint that Ziraat caused her to open a disjunctive joint account, rather than a two-signature account from which withdrawals could not be made without the consent of both owners, loses considerable significance upon scrutiny. Although the latter type of account would have prevented Cicek from withdrawing funds without Guirlando's knowledge and consent, it would also have given him control over Guirlando's own ability to withdraw the funds. Thus, the two-signature joint account that Guirlando purports to have preferred would have deprived Guirlando of independent access to her money. Her more logical complaint is that Ziraat did not allow her to open an individual account.

Even as to Ziraat's refusal to allow Guirlando to open an individual account, however, there are several flaws in the contention that that conduct had a direct effect in the United States. First, if Guirlando had deposited her check into an individual account as she wished, her money still would have left the United States. And while she argues that the transfer of her money from New York had a direct effect in the United States, it is clear from the face of the Complaint that that transfer is not what caused Guirlando's injury. Upon the arrival of Guirlando's

funds in Turkey, Guirlando had lost nothing. What caused her loss were the acts of Cicek--after the money had left the United States--in withdrawing most of the money from the Turkish account without Guirlando's consent.

Second, as held in the Antares litigation, although the breach of an agreement "to pay [money] . . . in New York" has the requisite direct effect in the United States, see Antares I, 948 F.2d at 95 (describing Weltover I, 941 F.2d at 153) (emphases added), "[t]he transfer of funds out of [a] New York bank account . . . [is] not [itself] sufficient to place the effect of [a] defendant['s] conduct 'in the United States' within the meaning of § 1605(a)(2)," Antares I, 948 F.2d at 95 (emphases added); see also Antares II, 999 F.2d at 36.

Although Guirlando argues that United States Fidelity & Guaranty Co. v. Braspetro Oil Services Co., No. 97 CIV. 6124, 1999 WL 307666 (S.D.N.Y. May 17, 1999) ("Braspetro"), denial of motion to dismiss for lack of subject matter jurisdiction aff'd substantially for the reasons stated in the district court opinion, 199 F.3d 94, 97 (2d Cir. 1999), stands for the proposition that "'[t]he fact that the plaintiffs, rather than the defendants, are to make payment in the United States does not diminish the effect in the United States'" (Guirlando brief on appeal at 27 (quoting Braspetro, 1999 WL 307666, at *14 (emphasis in brief omitted)), her reliance on Braspetro is misplaced. The Braspetro plaintiffs, sureties that had issued performance bonds for construction projects in Brazil, contended that the defendant

- 22 -

instrumentalities of Brazil ("Petrobras/Brasoil") had caused breaches of the underlying construction contracts and impaired the plaintiffs' suretyship status. The sureties sought declaratory relief as to their obligations under the performance bonds. There are several differences between Braspetro and the present case. To begin with, the commercial activity exception was applicable regardless of whether the alleged conduct of Petrobras/Brasoil had a direct effect in the United States because the first clause of the commercial activity exception applied, the performance bonds at issue having been negotiated in the United States. See 1999 WL 307666, at *12 ("Petrobras/Brasoil allegedly negotiated and procured performance bonds in New York . . . understood to be (although not contractually obliged to be) payable in New York" and thus were "not immune from federal jurisdiction under the FSIA" because such conduct was "sufficient to satisfy the first clause of the commercial activity exception." (emphasis added)).

Further, even with respect to the third clause of the commercial activity exception, the sureties' potential obligation to pay moneys from their New York accounts was not the only factor considered by the court. The court noted the assertion that Petrobras/Brasoil had caused the underlying construction contracts to be breached by their conduct in New York, see id. at *14; see also id. at *11 (Petrobras/Brasoil allegedly caused breaches "by directing the premature and excessive payment of millions of dollars from Brasoil's New York bank accounts to the [contractors]

- 23 -

for work that had not yet been performed and without the plaintiffs' consent").

And most importantly, Guirlando's reliance on <u>Braspetro</u> is misplaced because in <u>Braspetro</u> the nonperformance of the contractors, triggering the plaintiff sureties' obligations to make payments from their United States accounts, was caused by the alleged wrongful conduct of the defendants. Here, in contrast, transfer of Guirlando's money from New York to Turkey was the express goal of Guirlando herself--as she describes it:

> As set forth in the Amended Complaint, Mrs. G[ui]rlando walked into Ziraat Bank in Turkey, and immediately announced her purpose of opening an individual bank account into which she could deposit a check drawn on her New York bank account and payable to herself.

(Guirlando reply brief on appeal at 3; <u>see also</u> Guirlando brief on appeal at 39 ("The drawing of the check on the bank in New York . . . was Mrs. G[ui]rlando's only reason for opening an account at Defendant Ziraat Bank.").) Having engaged Ziraat for the express purpose of depositing her New York check into a new Turkish account, an act that by its nature would result in her money leaving the United States, Guirlando is not entitled to have the courts deny immunity to Ziraat on the theory that it was the conduct of Ziraat that caused that effect.

We note that the dismissal for lack of jurisdiction here does not leave Guirlando without recourse. In arguing in the district court that the United States is an inappropriate forum, Ziraat stated,

> [a]s stated in the accompanying Declaration of Yurdagül Rüzgar, First Legal Counsel to the Bank, Ziraat Bankasi is amenable to suit in Turkey and will not challenge the appropriateness of Turkey as the forum for litigating this action.

(Ziraat Memorandum of Points and Authorities in Support of Defendant's Motion To Dismiss at 7.)


## CONCLUSION


We have considered all of Guirlando's arguments on this appeal and have found them to be without merit. The judgment dismissing the action for lack of subject matter jurisdiction under the FSIA is affirmed.