10-4047-cv
*Rogers v. Petroleo Brasileiro*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: November 8, 2011                    Decided: March 13, 2012)

Docket No. 10-4047-cv(L) 10-4052-cv (Con)

DENNIS ROGERS, KEVIN BURLEW,

  *Plaintiffs-Appellees*,

  – v. –

PETROLEO BRASILEIRO, S.A.,

  *Defendant-Appellant.*

Before: MINER, POOLER, and PARKER, *Circuit Judges.*

  Defendant-appellant appeals from an Order filed in the United States District Court for the Southern District of New York (Gardephe, <u>J.</u>), denying its motion to dismiss for lack of subject matter jurisdiction, as asserted by plaintiffs-appellees pursuant to the commercial activities exception to foreign sovereign immunity as set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–11 (2006), in an action for breach of the terms and conditions of certain bearer bonds by failing to convert the bonds into preferred shares.

  Reversed..

<div style="margin-left: 40%;">

CARMINE D. BOCCUZZI, Cleary Gottlieb Steen & Hamilton LLP (Patrick J. Hurford and Alida Y. Lasker, <u>of counsel</u>), New York, New York, <u>for</u> <u>Defendant-Appellant</u>.

DAVID B. GORDON, Richardson & Patel, LLP, New York, New York, <u>for Plaintiffs-Appellees</u>.

</div>

-1-

MINER, Circuit Judge:[1]

Defendant-appellant Petroleo Brasileiro, S.A. ("Petrobrás" or the "Company") appeals from an Order filed September 27, 2010, in the United States District Court for the Southern District of New York (Gardephe, J.), pursuant to which the court, in a single Memorandum Opinion and Order, denied Petrobrás' motion to dismiss, for lack of subject matter jurisdiction, the plaintiffs-appellees', Dennis Rogers and Kevin Burlew (collectively, the "plaintiffs"), separate actions to recover for breach of contract.[2] The court based its subject matter jurisdiction determination on the commercial activities exception to foreign sovereign immunity as set forth in the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–11 (2006) ("FSIA"). The court also denied Petrobrás' motions to dismiss, made pursuant to Federal Rule of Civil Procedure 12(b)(6).

This appeal presents us principally with two issues arising under the FSIA. We must determine, as regards "clause two" of the commercial activities exception, whether the plaintiffs' claims are sufficiently "based upon" any act that Petrobrás performed in the United States that is "in connection with [Petrobrás'] commercial activity" in Brazil. Id. § 1605(a)(2). We also must decide, with respect to "clause three," whether Petrobrás' extraterritorial commercial acts caused a "direct effect" in the United States. Id. In both cases, Petrobrás contends that the District Court erred in finding the requirements of the exceptions to be satisfied and thus argues that the court lacked jurisdiction over the actions. For the reasons that follow, we hold that Petrobrás is immune under

---

[1] Judge Roger J. Miner drafted the opinion for the Court prior to his passing on February 18, 2012.

[2] The two actions never were consolidated by a formal order; however, the District Court's docket reflects that on November 6, 2009, Burlew's action was "accepted as related" to Rogers' action. Because the plaintiffs filed virtually identical complaints, submitted by the same counsel, we generally discuss them as a single action, as did the District Court.

the FSIA and therefore reverse the Order of the District Court.

## BACKGROUND

On October 3, 1953, the Brazilian legislature enacted Brazil Law 2.004. As relevant to this appeal, the law (i) established Petrobrás as the Brazilian state-owned oil company and (ii) imposed a compulsory fee, to be paid annually from 1954 through 1957, on all owners of motor vehicles in Brazil. Approximately two years after Petrobrás' incorporation, on December 20, 1955, the Company approved the issuance of four series of bearer bonds (the "Bonds"). The Bonds were issued in the Portugese language to holders of certificates evidencing payment of the compulsory motor vehicle fee imposed by Brazil Law 2.004. Each of the four series of Bonds corresponds to certificates evidencing payment of the compulsory fee in a particular year — 1954 to 1957, respectively.

The "conditions" of Petrobrás' Series 1 bearer bonds,[3] issued on May 31, 1956, read as follows (in translation):

> Petróleo Brasileiro, S.A. - Petrobrás - owes to the holder of this Certificate the amount of one thousand (1,000) cruzeiros corresponding to the contribution it received in 1954, pursuant to the provisions of Section 15 of Law No. 2,004 of October 2, 1953 . . . and it will pay to it, up to their redemption, per accrued semester, interests at 7% (seven percent) per year, in accordance with the resolution of the general shareholders' meeting in an extraordinary session held on December 20, 1955. . . .
>
> The bearer obligations of this series are issued at this Company's discretion, pursuant to the provisions of Section 15 of Law No. 2,004, of October 3, 1953, and they are delivered to the holders of certificates of paid contributions by the owners of motor cars, in 1954. . . .
>
> The following are conditions of this issuance:

---

[3] The "conditions" of the other Bonds are identical, except that the Series 3 bonds were issued on November 30, 1957, and had a redemption period from January 1, 1960 to December 31, 1979, and the Series 4 bonds were issued on February 17, 1959, and had a redemption period from January 1, 1961 to December 31, 1980. The Series 2 bonds are not at issue on appeal.

1st) Redemption as from January 1, 1958, so that it is fully paid up on December 31, 1977;

2nd) The total or partial redemption may be advanced, either by purchase in the Stock Exchange, or by sort at par;

3rd) The obligations shall have interests at 7% per year, accrued per semester, as from January 1, 1955;

4th) The interests shall be paid semi-annually, in March and September each year;

5th) The Federal Government is jointly liable, in any case, for the nominal value of this bond, pursuant to the provisions of Section 15, of Law No. 2,004, of October 3, 1953;

6th) Petróleo Brasileiro S.A. - Petrobrás entitles to the holder of this obligation the option for receiving preferred nominative shares without voting rights, after the bond party meets the requirements of the Corporation Law and Section 18 of Law No. 2,004 of October 3, 1953.

Thus, a holder of any such Bond was entitled to collect bi-annual interest payments, at seven percent, throughout the specified redemption period. In addition, Petrobrás assumed the obligation to return to the Bondholder the nominal value — 1,000 cruzieros — of the Bond. In the alternative, the "conditions" of the Bond permit its holder, after meeting certain conditions, to receive "preferred nominative shares without voting right" — specifically, a conversion right in lieu of payment.

Petrobrás apparently honored the Bonds — payment of interest and return of the nominal value of the Bond or, in the alternative, conversion — throughout the specified redemption periods. After the end of those redemption periods, it was Petrobrás' understanding that the Bonds lapsed (i.e., had no further value), based on "the conditions stated on the back of the bonds themselves." Since that time, Bondholders who did not demand redemption or conversion before the end of specified redemption period nonetheless have sought to redeem or convert their bonds, requests that Petrobrás consistently has denied. After a complaint was filed with the Commission of Defense

of Citizen's Rights in Brazil in 1989, the Brazilian President's Office issued a report finding no violation of Bondholders' rights because "[b]earers who fail to make a statement within the time limit will not be able to request such redemption, nor request conversion."  Commission of Defense of Citizen's Rights, No. 3.337-5/87 (Brazilian President's Office, July 20, 1989).[4]

Petrobrás has taken certain steps to communicate the foregoing to its investors.  Through its Investor Relations Department in Rio de Janeiro, Brazil, it drafted a notice (in Portuguese) dated March 23, 2003, explaining the history of the Bonds and setting forth the rationale for its decision to reject any untimely requests to convert or redeem the bonds on the ground that any redemption or conversion rights had lapsed.  In relevant part, the notice states that the Bonds "are over twenty years old, and holders who did not assert their rights in good time may not now claim the redemption value or request conversion.  The rights represented by these papers have lapsed, in accordance with Brazilian Civil Law and as stipulated on the back of these Bonds."  That notice apparently has been translated, at least into English, and has been made available to an Investor Relations office that Petrobrás maintains in New York City.

This appeal arises out of an attempt by two United States citizens to convert these Bonds. Dennis Rogers (a citizen of Florida) and Kevin Burlew (a citizen of Connecticut) own Series 1, 3, and 4 Bonds.  They claim that the Bonds were purchased in the United States with U.S. currency; however, the record does not provide additional detail regarding these transactions.  On June 22, 2009, the plaintiffs each sent a letter to Petrobrás' New York office requesting the conversion of

---

[4] Bondholders also have sought to enforce redemption or conversion of the Bonds through litigation in the Brazilian courts.  Those attempts, and the relevant decisions by the Brazilian courts and administrative bodies, are not relevant to the resolution of this appeal.

their Bonds into preferred shares.[5]  On June 25, 2009, Theodore M. Helms, an Executive Manager

of Investor Relations for Petrobrás, responded to the plaintiffs' letters by email, informing them that

the office "regularly receive[s] inquiries about these [B]onds" and that the Bonds "are no longer

convertible."  Helms attached the notice from Petrobrás' Investor Relations Department detailing

Petrobrás' understanding of the history and legal standing of the Bonds.

Unsatisfied with the response received from Petrobrás, on September 25, 2009, the plaintiffs

filed separate actions in the Southern District of New York claiming breach of contract based on

Petrobrás' refusal to convert the Bonds into preferred shares.  Specifically, the plaintiffs identify

Helms' email and the attached notice as the act that allegedly constitutes the breach.  Petrobrás filed

separate motions to dismiss each action on January 6, 2010, arguing, inter alia, that the court lacked

subject matter jurisdiction under the FSIA because none of the statute's three "commercial activity"

exceptions apply to afford the court jurisdiction.

In a single Memorandum Opinion & Order filed on September 27, 2010, the District Court

denied Petrobrás' motion.  Rogers v. Petroleo Brasileiro, S.A., 741 F. Supp. 2d 492, 496 (S.D.N.Y.

2010).  The court discussed two "commercial activity" exceptions into which it concluded that

Petrobrás' actions fell: (1) an act performed in the United States in connection with commercial

activity elsewhere ("clause two") and (2) an act outside the United States in connection with a

---

[5] Petrobras does not have any preferred shares that trade in the United States.  Rather, Petrobras participates in an American Depositary Receipt ("ADR") Program through JPMorgan, and it is these ADRs, not actual preferred shares, that trade on the New York Stock Exchange.  See Petrobras Selects JPMorgan for $25 Billion ADR Program (Jan. 2, 2007), http://www.jpmorgan.com/tss/General/ Petrobras_Selects_JPMorgan_for_25_Billion_ADR_Program/1159299617120 (last visited Feb. 2, 2012).

commercial activity of the foreign state elsewhere and that causes a direct effect in the United States ("clause three").[6] Id. at 501–03.

As to clause two, the court first found that "[t]he threshold inquiry of whether Defendant was engaged in 'commercial activity' sufficient to trigger the statutory exceptions to immunity is quickly resolved," noting that it is well-settled that "the issuing of public debt is a commercial activity within the meaning of Section 1605(a)(2)." Id. at 500 (citing Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1018–19 (2d Cir. 1991)). The court also found to be satisfied the requisite nexus between Petrobrás' alleged act of breach (i.e., the sending of the email at issue) and the United States, finding that Petrobrás "used its New York office and its New York representative to carry out and finalize the 'act' of alleged breach at issue." Id. at 501.

With respect to clause three, the court found that Petrobrás' act was "direct" because its Investor Relations representative communicated the Company's rejection of the plaintiffs' conversion request through its New York office, and the "immediate consequence" of that act deprived the plaintiffs of an alleged contractual right. Id. at 502. Moreover, the court found that the "effect" of the alleged breach was felt in the United States not only because the plaintiffs are United States citizens, but also, and more importantly, because the plain language of the Bonds did not specify or require a place of payment or conversion within the United States, but rather was open-ended. Id. at 503 ("That the [B]onds do not specify or require a place of payment or exchange within the United States does not foreclose that Plaintiffs reasonably expected they could make such a request in New York, given the open ended terms of the bonds and the fact that Petrobrás has a New York office.").

---

[6] The plaintiffs also argued that "clause one" — an action based upon a commercial activity carried on in the United States by a foreign state — supported jurisdiction. The District Court did not, however, discuss this clause.

After the District Court issued its Memorandum Opinion & Order, Petrobrás filed a timely Notice of Appeal to the extent that the District Court "denied Petrobrás' motion to dismiss on grounds of sovereign immunity" under the FSIA and "asserted subject matter jurisdiction."

On appeal, Petrobrás challenges the District Court's assertion of jurisdiction over the action. With respect to clause two, Petrobrás argues that the plaintiffs' claims are not sufficiently "based upon" any act that it performed in the United States because the sending of an email was not the "but for" cause of the plaintiffs' claim for breach of contract. Moreover, Petrobrás contends that the Bonds can be converted only in Brazil, which by definition cannot be an "act performed in the United States," a necessary element of clause two. As to clause three, Petrobrás argues that the District Court erred in finding that there was a reasonable expectation that the Bonds could be tendered for conversion in New York. Rather, it argues that the Bonds do not provide for performance in New York or give the holder an option to designate New York, and the only understanding is that the Bonds would be tendered in Brazil. As such, Petrobrás claims that the District Court erred in finding a direct effect in the United States.

**ANALYSIS**

I.      Standard of Review

Our jurisdiction in this case is based on the collateral order doctrine, which "allows an immediate appeal from an order denying immunity under the FSIA." Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 153 (2d Cir. 2007) (internal quotation marks omitted). We review de novo "a district court's legal determinations regarding its subject matter jurisdiction, such as whether sovereign immunity exists" and review its factual findings for clear error. Filler v. Hanvit Bank, 378 F.3d 213, 216 (2d Cir. 2004). II.    Subject Matter Jurisdiction

A.    Applicable Law

The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989). The Act states that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607." 28 U.S.C. § 1604 (2006). The District Court found, and the parties do not dispute on appeal, that Petrobrás is a "foreign state." We agreee. U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs., Co., 199 F.3d 94, 98 (2d Cir. 1999) (per curiam) (noting that "acts of Petrobrás" were "[a]cts of the state"). That being the case, "the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Kensington, 505 F.3d at 153 (internal quotation marks omitted). "Where the plaintiff satisfies [his or] her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not apply." Swarna v. Al-Awadi, 622 F.3d 123, 143 (2d Cir. 2010).

Here, the "commercial activity" exception, set forth in section 1605 of the FSIA, is the only such exception at issue.

This section provides, in part:

(A) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .

(2) in which the action is based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

28 U.S.C. § 1605(a)(2) (2006). "As is plain from the language of the section, each of its three clauses describes different categories of conduct for which the foreign state is denied immunity." Guirlando

v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010). A showing that one condition is met is sufficient for the commercial activity exception to apply. Kensington, 505 F.3d at 154. The second and third clauses are at issue in this appeal.

B.      Threshold Issue with the Complaints

Before venturing into our analysis of the commercial activity exceptions, we pause to address our concern with the way in which the plaintiffs have attempted to define their action (i.e., in terms of breach of contract). Based on an examination of the plain language of the Bonds, we are not convinced that there was a breach of contract at all.

To wit, the terms and conditions on the face of the Bonds define "Bearer Obligation" in terms of what Petrobrás owes to the Bondholders, namely the nominal value of 1,000 cruzeiros and bi-annual interest payments of seven percent "up to [the Bonds'] redemption." In the alternative, the sixth "condition of . . . issuance" in each of the series of Bonds at issue provides that "the holder of this obligation [is entitled to] the option for receiving preferred nominative shares without voting rights, after the [B]ond party meets [certain] requirements." From the very terms of the Bonds, however, an "obligation" existed only through 1977 (or as late as 1980, in the case of the Series 4 bonds), the exact date corresponding to a Bond's specified redemption period. After the expiration of the redemption period, we believe that the Bonds no longer had a residual benefit. Therefore, in all cases, there is no current "obligation" as contemplated by the terms of the Bonds, the latest redemption period (for the Series 4 Bonds) having expired on December 31, 1980. There being no obligation, Petrobrás has no duty to honor an attempt by a Bondholder to convert, and a decision not to convert cannot be a breach, as the Bondholder is not deprived of any contractual right.

Notwithstanding our grave concerns regarding the merits of the complaint, we proceed, as we must, first to determine issues of subject matter jurisdiction. Robinson v. Gov't of Malaysia, 269

F.3d 133, 141 (2d Cir. 2001) ("A . . . court does not . . . decide a case on the merits in order to decide if it has jurisdiction.  Jurisdiction is not defeated by the possibility that averments might fail to state a cause of action." (internal quotation marks and alteration omitted)).  For the following reasons, even if the Bonds continue to have a residual benefit, no exception to the FSIA affords the District Court subject matter jurisdiction.

C.      Clause Two

The second clause of the commercial activities exception applies if a plaintiff's action is "based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  28 U.S.C. § 1605(a)(2) (2006).  The Supreme Court has held that jurisdiction will lie where an action is "'based upon' some 'commercial activity'. . . that had 'substantial contact' with the United States . . . ."  Saudi Arabia v. Nelson, 507 U.S. 349, 356 (1993).  The Court explained that the "based upon" requirement is satisfied if the "act performed in the United States" constitutes an "element[ ] of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  Id. at 357.  We have expounded on Nelson, holding that "based upon," at the very least, requires "but for" causation.  Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 390 (2d Cir. 2000).

However, to resolve whether clause two applies to provide the District Court with a jurisdictional basis in this case, we need not reach the "based upon" analysis.  A threshold requirement under the statute itself (and therefore under both Nelson and Transatlantic) is that the relevant act was performed in the United States.  That requirement is not met here.  The plaintiffs have suggested that the email sent by Petrobrás' Investor Relations employee in the United States was the breach of contract and thus an "act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  We disagree.  In Guirlando, 602 F.3d at 66, we

-11-

explored, at length, the "metaphysical conundrum" that arises within the FSIA context when a

foreign sovereign's relevant act actually is an omission — here, the failure to convert.[7] We stated:

> The decision by a foreign sovereign not to perform is itself an act, but it is not an act
> in the United States; it is an act in the foreign state.  A decision not to act, standing
> by itself, does not have an effect until there has been an anticipatory repudiation or a
> failure to act at the time required.  And although the failure to act may have a legally
> significant effect in the place where the act was to have been performed, the failure
> to act is not itself an act [in the United States].

Id. at 76.

Guirlando's observations are in line with other courts to have been confronted with a similar

"conundrum."  For example, in United States v. Swiss Am. Bank, Ltd., 274 F.3d 610 (1st Cir. 2001),

the First Circuit, in conducting a "minimum contacts" analysis, determined that a letter from a

foreign bank to a district court "simply g[iving] notice that payment might not occur" was "only

marginally instrumental to the alleged breach [of failing to turn over forfeited drug proceeds from an

account-holder's account]" and therefore insufficient to satisfy a "contract-plus" requirement.  Id. at

622 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478–79 (1985)) ; see also Elliott v. Armor

Holdings, Inc. No. 99-337-B, 2000 WL 1466112, at *8 (D. N.H. Jan. 12, 2000) ("Properly construed,

the correspondence and any related telephone calls constitute notice to [the plaintiff] of the alleged

breach, rather than the actual mechanism of breach." (citing Ticketmaster N.Y., Inc. v. Alioto, 26

F.3d 201, 207 (1st Cir. 1994))).

Here, in accordance with Guirlando, Petrobrás' denial of the conversion sought by the

plaintiffs was an act in Brazil based on the terms and conditions of the Bonds.  The email sent to the

---

[7] That our discussion in Guirlando was within the context of clause three is of no difference since there is
no indication that the word "act" has a distinct meaning in different parts of the "commercial activities"
exception.  See Kensington, 505 F.3d at 155–56 (discussing the same issue with respect to the phrase "based
upon" and holding that "[a]bsent any indication from Congress to the contrary, we do not believe that the
phrase 'based upon' has distinct meanings in different parts of the same provision of the statute").

-12-

plaintiffs by Helms, while sent from the Unites States, "constitute[d] notice to [the plaintiffs] of the alleged breach, rather than the actual mechanism of breach." Elliott, 2000 WL 1466112, at *8 (emphasis supplied). Thus this act simply cannot fall within the purview of clause two.

D.    Clause Three

Clause three of the commercial activities exception strips a foreign sovereign of its immunity when a court determines that a plaintiff's action is "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2) (2006) (emphasis supplied). The Supreme Court has held that "an effect is direct if it follows as an immediate consequence of the defendant's . . . activity." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992) (internal quotation marks and alteration omitted); accord Martin v. Republic of S. Africa, 836 F.2d 91, 95 (2d Cir. 1987) ("The common sense interpretation of a 'direct effect'" within the meaning of § 1605(a)(2) "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.").

In cases involving the default by a foreign state or its instrumentality on its commercial obligations, an act has a direct effect in the United States if the defaulting party is contractually obligated to pay in this country. Weltover, 504 U.S. at 611, 618–19; see also Comm. Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241 (2d Cir. 1994); Texas Trading & Mill. Corp. v. Fed. Republic of Nigeria, 647 F.2d 300, 312 (2d Cir. 1981), overruled on other grounds by Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393 (2d Cir. 2009) (finding a direct effect where New York corporations sought unsuccessfully to enforce a contract in New York City, such that the financial loss and breach both occurred in the United States). In Weltover, the Republic of Argentina issued bonds with an explicit provision that permitted the holder to designate

-13-

either London, Frankfurt, Zurich, or New York as the place for the payment of principal and interest. Id. at 609–10. The Weltover plaintiffs so designated New York. Id. at 619. At the time when the plaintiffs' principal and interest payments became due, Argentina instead rescheduled them. Id. Several bondholders rejected the rescheduled payments and instead demanded full payment in New York. Id. On these fact, the Supreme Court held that, because the plaintiffs "designated their accounts in New York as the place of payment, . . . New York was thus the place of performance for Argentina's ultimate contractual obligations, [and] the rescheduling of those obligations necessarily had a 'direct effect' in the United States." Id.

Beyond this scenario, we have found the direct effect requirement satisfied where a defaulting party agreed in advance, pursuant to the terms of a letter of credit, to make payments "according to [a payee's] instruction," and the payee selected a New York bank. Hanil Bank v. PT Bank Negara Indonesia (Persero), 148 F.3d 127, 132 (2d Cir. 1998). On the other hand, we have held, in the RICO context, that there was no direct effect in the United States where (i) certain prepayment agreements were negotiated in France and governed by French law, (ii) did not require performance in the United States, and (iii) the plaintiff was a foreign corporation that did not suffer any demonstrable harm in the United States. Kensington, 505 F.3d at 158; see also Int'l House. Ltd. v. Rafidain Bank Iraq, 893 F.2d 8, 12 (2d Cir. 1989) (finding no direct effect in the United States even though a payment had in fact been made to Rafidain's U.S. "correspondent" bank account because, inter alia, the "[p]ayment in New York City was not a contractual requirement" under the guaranty bonds); Filetech S.A. v. France Telecom, S.A., 212 F. Supp. 2d 183, 197 (S.D.N.Y. 2001) aff'd and opinion adopted and incorporated as the law of the Circuit by, 304 F.3d 180, 182 (2d Cir. 2002) ("In [Weltover] and its progeny, the ultimate object of the contract — the contract's raison d'etre — was the payment of funds in the United States. In the case at bar, there is no evidence that

-14-

[the defendant's] activities in France intended or contemplated a specific effect in the United States." (citation omitted)).

Here, as in <u>Kensington</u>, <u>Rafidain Bank</u>, and <u>Filetech</u>, there was no requirement that payment be made in the United States nor any provision permitting the holder to designate a place of performance. And contrary to the District Court's finding, there is nothing in the language of the Bonds that suggests a reasonable understanding that the United States could be a possible place of performance. The Bonds were issued in the Portuguese language as evidence of payment of the Brazilian compulsory motor vehicle fee. <u>See Kensington</u>, 505 F.3d at 157 (holding that prepayment agreements had "no connection" to the United States where they "were negotiated in France, written in French, apply to foreign entities, and specify France as the exclusive jurisdiction to resolve disputes").[8] Thus the court's reliance on <u>United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.</u>, No. 97 Civ. 6124 (JGK), 1999 WL 307666 (S.D.N.Y. May 13, 1999), <u>denial of motion to dismiss for lack of subject matter jurisdiction aff'd substantially for the reasons stated in the district court opinion</u>, 199 F.3d 94, 97 (2d Cir. 1999), was misplaced because in that case, the court found a direct effect to exist where, <u>inter alia</u>, the bonds at issue were "understood to be (although not contractually obliged to be) payable in New York." <u>Id.</u> at *12. Moreover, the plaintiffs in <u>Braspetro</u>, as a result of their default, were required to pay "substantial damages in United States dollars" from United States bank accounts, and the court found that "[t]he payment of such a large sum of money from United States accounts," certainly causes a direct effect. <u>Id.</u> at *13. No such "specific effect" in the United States was "intended or contemplated" by the parties here. <u>Filetech</u>, 212 F. Supp. 2d at 197; <u>Filetech</u>, 304 F.3d at 182.

---

[8] The parties dispute the extent to which Brazilian law applies. We express no opinion as to this dispute.

Finally, we note that the plaintiffs' status as United States citizens does not sufficiently outweigh the fact that payment was not contemplated in the United States so as to afford the District Court jurisdiction. See Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 240 (2d Cir. 2002) (holding that the theory that "any U.S. corporation's financial loss constitutes a direct effect in the United States [to be] plainly flawed" and observing that its reasoning was equally applicable to a natural person); Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993).

\* \* \*

That no exception strips Petrobrás of its immunity in this case accords with the policies underlying the FSIA — policies that we are to "remain mindful of" in considering FSIA jurisdiction. Weltover, Inc. v. Rep. of Argentina, 941 F.2d 145, 151 (2d Cir. 1991). To this end, we have held that "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." Virtual Countires, 300 F.3d at 236 (internal quotation marks omitted). The ripples are indeed very faint in this case, and we easily conclude that "the United States does not have an interest in this action such that Congress would have wanted an American court to hear the case." Rafidain Bank, 893 F.2d at 12 (internal quotation marks omitted).

We have considered all of the plaintiffs' other arguments and find them to be without merit.

## CONCLUSION

For the foregoing reasons, neither clause two nor clause three of the commercial activities exception strips Petrobrás of its immunity under the FSIA. Therefore, we **REVERSE** the judgment of the District Court.

-16-